**John COCKRUM, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69766.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 14, 1988.

Rehearing Denied Oct. 12, 1988.

---

Rick C. Shumaker, David W. Malaby, Jr., Texarkana, for appellant.

John F. Miller, Jr., Dist. Atty. and James Elliott, Asst. Dist. Atty., Texarkana, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Justice.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, § 19.03(a)(2). The appellant was convicted of intentionally causing the death of Eva Mae May in the course of committing and attempting to commit the offense of aggravated robbery. After finding the appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071 V.A.C.C.P. Punishment was assessed at death. We will affirm.

The appellant raises five points of error. He challenges: the sufficiency of evidence corroborating the accomplice witness testimony, the denial of a motion for change of venue, the trial judge's use of a "bifurcated" voir dire procedure, the denial of motions to excuse three separate veniremen, and the sufficiency of evidence to support the jury's affirmative answer on the second special issue.

Because appellant challenges the sufficiency of corroborating evidence, a detailed review of the facts is necessary. The body of Eva May was discovered on the morning of May 29, 1986. The deceased's body was discovered on the floor of her store, located in DeKalb, Bowie County. Mike Crump testified that he stopped at the store to buy a pack of cigarettes. As Crump left his car, he was met by a Mr. Brooks. Brooks was excited and waved to Crump to join him. Brooks lead Crump into the store, where the two men saw the deceased's body on the floor. Crump called the Sheriff's Department, and the first deputy arrived on the scene approximately fifteen minutes later. Deputy Downs was first to arrive, followed a few minutes later by Deputy Huggins. Huggins testified that he and Downs secured the crime scene, erected a police line, took the names of those present, and waited for crime scene investigators to arrive. Thomas Hodge, the sheriff of Bowie County, arrived at the

scene in order to lead the investigation. Sheriff Hodge testified that there was wet blood around the deceased. He said that this would indicate that "it had not been very long before the incident had occurred." In addition, he identified crime scene photographs and described some of the investigative procedures used.

Sheriff Hodge also testified in regard to his department's investigations away from the actual scene. He testified that Kenneth Thom approached the department with information implicating appellant and Jerry Morgan, the accomplice witness. Pursuant to this tip, Sheriff Hodge arrested Morgan. Morgan told Sheriff Hodge that appellant had borrowed a spoon from him so as to bury the murder weapon and the deceased's purse. Sheriff Hodge, using a metal detector, found these items buried on appellant's ranch. They were discovered in the general area which Morgan had said appellant had taken the items. Finally, Sheriff Hodge identified a .22 caliber Ruger Black Hawk pistol as the one he discovered at Morgan's ranch.

Kenneth Thom testified that he went to Morgan's ranch around 2:00 A.M., the night of the murder. When Thom arrived, appellant was present and working on a car. He had a .22 revolver tucked into the back of his pants. Morgan, the accomplice, was also present and armed with a .38 caliber pistol. At 4:50 A.M., appellant and Morgan left in Morgan's truck. Before departing, Morgan put his gun in the house. The two returned to the ranch approximately two and one half hours later. As soon as they got out of the truck, appellant went to the bathroom and came out with his shirt off. He sat down, turned the volume up to full on Morgan's police frequency scanner, and sat, "looking down the road." The .22 was still tucked in appellant's pants, and he appeared to be "scared and kind of nervous." Thom left soon after the two returned. That afternoon, Thom heard that Eva May had been killed. Based on what he had seen at the ranch and the fact that the ranch is located 10 minutes from the deceased's store,

Thom thought that appellant and Morgan might have been involved in the killing. He reported his suspicions to the Bowie County Sheriff's Department.

Larry Fletcher, a firearm examiner for the Dallas County Institute of Forensic Sciences, testified that the bullet which killed Eva May was a .22 magnum. He also testified that the weapon discovered at Morgan's ranch was a .22 magnum. This gun was in poor condition. It had a broken grip and a large amount of rust on its outside surfaces and inside the barrel. This rust damage, Fletcher said, would be consistent with a gun which had been buried. While the gun was of the general type used in the murder, the rust inside the gun prevented Fletcher from obtaining meaningful results from a ballistics comparison.

Jana McGraw, appellant's girlfriend, was also able to place appellant at Morgan's Ranch on the night before the killing. McGraw identified the gun which Sheriff Hodge recovered as the same gun that appellant had on the day of the murder. She left the ranch at around 12:30 A.M. and did not see appellant again until the next afternoon. That afternoon, she and appellant drove to Morgan's ranch. When they arrived, they noticed two police cars parked in front of the house. Appellant asked McGraw to drive him to Texarkana, Arkansas. As the two pulled out, he said that there were some things in his truck and that his gun was "back there too." On the drive out of state, appellant told McGraw, "to speed up . . . that I'd better not get him stopped." At this point, appellant seemed nervous and he asked McGraw if she would "run with him." She asked what he was running from, but appellant did not answer.

In Texarkana, appellant checked into the Super 8 motel, signing a false name. In the room, appellant displayed a large amount of money.[1] McGraw said this was strange because appellant was unemployed and had not had any money a few days before. Appellant sent McGraw to the store to buy some clothes, shampoo, and other items. Later, McGraw decided to

---

1. When appellant was arrested he had $1,015 in his possession.

return home to get her clothes for work the next day. When she got home, she was met by an Officer Huff. He asked McGraw of appellant's whereabouts. After being told of her potential criminal culpability, McGraw told Huff where he could find appellant. Appellant was arrested in his motel room.

According to Morgan's testimony, on the night of the murder appellant asked Morgan for a ride to "go snatch a purse." Appellant was carrying the gun that was identified as the gun discovered at the ranch. Morgan drove, and appellant gave directions. According to appellant's directions, Morgan drove to Eva May's store. Appellant told Morgan to stop there and got out of the truck about 200–300 yards from the store. As he stepped out, appellant told Morgan to pick him up in about thirty minutes. Morgan returned about an hour later. Appellant jumped out of some weeds at the side of the road and got in the truck. Morgan asked him if he "done any good." Appellant said that he had and added that he did not know how much money he had gotten. After Morgan and appellant returned to the ranch, Morgan resumed working on cars and appellant went into the house. After the others who were present left, Morgan went into the house. Morgan said that appellant seemed nervous. Morgan told him that "it wasn't no big deal." Appellant replied, "I killed her." Appellant then asked for the spoon and went out the back of the house. Morgan then left the ranch.

█ Appellant contends that the evidence adduced at trial is insufficient to corroborate the testimony of Jerry Morgan, an accomplice witness. No one may be convicted on the basis of accomplice testimony without other evidence which corroborates the accomplice testimony and tends to connect the defendant with the commission of the charged offense. Art. 38.14 V.A.C.C.P.; e.g. *Killough v. State*, 718 S.W.2d 708, 710 (Tex.Cr.App.1986). The test for weighing the sufficiency of corroborative evidence is to eliminate from consideration the testimony of the accomplice witness and then examine the testimony of other witnesses to ascertain if there is evidence which tends to connect the accused with the commission of the offense. *Reed v. State*, 744 S.W.2d 112, 125 (Tex.Cr.App. 1988), *Cruz v. State*, 690 S.W.2d 246 (Tex. Cr.App.1985); *Brown v. State*, 672 S.W.2d 487 (Tex.Cr.App.1984). The evidence which has been previously set out provides adequate corroboration for Morgan's testimony. We will review these corroborative factors point by point.

First, Sheriff Hodge's testimony establishes that the crime occurred a fairly short time before the body's discovery around 8:00 A.M. Kenneth Thom testified that he saw appellant and Morgan return to the ranch, together, at approximately 7:15 A.M. Evidence that a defendant was in the company of the accomplice at or near the time or place of a crime is proper corroborating evidence. *Jackson v. State*, 745 S.W.2d 4, 13 (Tex.Cr.App.1988); *Mitchell v. State*, 650 S.W.2d 801, 808 (Tex.Cr.App.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221, reh'g denied, 465 U.S. 1074, 104 S.Ct. 1431, 79 L.Ed.2d 755 (1984); *Passmore v. State*, 617 S.W.2d 682, 684 (Tex.Cr. App.1981); *Lyman v. State*, 540 S.W.2d 711, 714 (Tex.Cr.App.1976). This evidence places appellant with the accomplice within a ten minute drive of the crime scene, immediately before and after the crime's commission.

Second, the appellant's demeanor after the crime suggests guilty knowledge. Thom testified that when the appellant returned to the ranch with Morgan, he appeared to be nervous. Also, he was listening intently to a police scanner while staring down the road leading to the building from which he waited and watched. McGraw testified that appellant seemed nervous at the sight of a police car. All of these factors are indicative of guilty knowledge. As such, they serve to circumstantially corroborate Morgan's statement that appellant was involved in the murder. Furtive, nervous behavior, as an indicia of guilty knowledge, may be used to corroborate accomplice testimony. See *Brown*, supra.

Third, appellant was seen with a gun similar to the one used in the offense. Both Thom's and McGraw's testimony establish this connection. Fletcher's ballistics testimony did not definitely establish that the gun retrieved from Morgan's ranch was the one used in the murder; however, the evidence does show that the gun was of the same type as used in the murder. Proof that connects an accused to a weapon used in an offense is proper corroborative evidence. *Jackson*, supra; *Killough*, supra; *Mitchell*, supra; *Eckert v. State*, 623 S.W.2d 359 (Tex.Cr.App.1981). Even evidence that a defendant had a gun which was merely similar to the murder weapon may corroborate accomplice testimony. *May v. State*, 738 S.W.2d 261 (Tex. Cr.App.1987).

Fourth, McGraw testified that appellant asked her to drive him to Arkansas upon seeing police cars parked at Morgan's ranch. During the drive, appellant talked about "running" and warned McGraw not to get *him* stopped by the police. Upon arriving in Arkansas, appellant checked into a motel under an assumed name. He did not leave the motel; instead, he sent McGraw out to buy necessities. This evidence shows flight, and, as such, serves to corroborate the accomplice testimony. *Passmore*, supra; *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1979). In addition, the use of a false name immediately after commission of an offense tends to connect a defendant to that offense. *Killough*, supra.

Finally, when arrested, appellant had $1,015 in his possession. Coupled with McGraw's statement that appellant was unemployed and without money four days prior to the offense, it is reasonable to conclude that this money was the fruit of the offense. Possession of a large amount of money tends to connect a defendant to the theft of a large amount of cash. *Killough*, supra.

When considered jointly, appellant having been in the company of the accomplice, before and after the offense; his demeanor immediately after the offense; his possession of a gun very much like the murder weapon; flight out of state under a false name; and the unexplained possession of a large sum of money serve to corroborate the testimony of accomplice-witness Morgan. Appellant's first point of error is overruled.

In his second point of error, appellant argues that the trial judge erred by overruling a motion for change of venue. In raising the point, appellant makes two separate arguments: (1) the State's controverting affidavits were insufficient; therefore, appellant was entitled to a change of venue as a matter of law. (2) After hearing the evidence and arguments, the trial judge incorrectly found that appellant could receive a fair trial in Bowie County. We will address these arguments in the order presented.

Appellant moved for a change of venue pursuant to Art. 31.03 V.A.C.C.P.. Supporting affidavits were signed by two representatives of local newspapers. The State does not challenge the adequacy or form of appellant's motion or any of the supporting affidavits. The State's compurgators were the Sheriff of Bowie County and a Texarkana bailbondsman. Each of these men signed a form affidavit with blanks provided for the compurgator's name and signature. The affidavits stated, in relevant part:

> My name is _____ and I am a resident of Bowie County, Texas. I have read the affidavits in support of Defendant's Motion for Change of Venue in this cause. The affiants of said affidavits are not credible as they are prejudiced to said Defendant and their means of knowledge are not sufficient to support and justify the statements contained therein.

Each affidavit facially satisfies the requirements of Art. 31.04 V.A.C.C.P..[2]

**2.** The article states:
Art. 31.04. Motion May be Controverted
The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person. The issue thus formed shall be tried by the judge and the motion

At the hearing on appellant's motion for change of venue, both of the State's compurgators testified that they did not personally know appellant's compurgators, whether those compurgators were biased, or what basis of knowledge the compurgators had. David Lane, the first of the State's two compurgators, further testified that he had not read either of appellant's supporting affidavits. All of this testimony was contrary to the facts sworn in the State's affidavits. Because of this inconsistency, appellant argues that the State's affidavits should be struck.[3]

■ The State counters that appellant failed to make a timely objection to the form of the affidavits. Appellant concedes that the State's affidavits are facially sufficient. Only after each of the State's witnesses testified, appellant argues, did he discover that they did not have knowledge of the matters sworn in their affidavits. We hold that an objection to the sufficiency of a compurgator's knowledge, when the affidavit appears proper on its face, is timely, if made before the close of a change of venue hearing. Further, appellant made the following objection before the close of the hearing:

> Your Honor, we have two Motions. First, the Motion for Change of Venue should be granted as a matter of law. Both Affiants on the controverting Affidavits have no personal knowledge to testify about the credibility of the Affiants in support of the Motion. Therefore, both controverting Affidavits are deficient as a matter of law and should be struck from the record, and the Motion should be granted as a matter of law.

We find that this motion is specific as to the grounds offered and the remedy de-

sired. It fulfills all of the functions of a proper trial objection. See now Tex.R.App. Pro. 52(a). Appellant properly preserved this issue for appellate review.

■ Having decided that this question is in the correct posture, we move to the merits of appellant's argument. The purpose of the State's controverting affidavits is to provide a form of pleading which establishes that there is a factual dispute in need of resolution. See Art. 31.04 V.A.C. C.P.; *Roy v. State,* 608 S.W.2d 645, 648 (Tex.Cr.App.1980); *Kolar v. State,* 705 S.W.2d 794, 796 (Tex.App.—Houston [1st] 1986, no pet.). Facially, the State's affidavits created a factual dispute which required a hearing; therefore, they served the purpose of such pleadings, namely to inform appellant and the trial judge that the State will take issue with the facts asserted by appellant.[4]

Appellant's second contention is that upon hearing the evidence adduced at the change of venue hearing, the trial judge should have granted appellant's motion. In *Lundstrom v. State,* 742 S.W.2d 279 (Tex.Cr.App.1987) (rehearing denied January 6, 1988), this Court held that the State may raise an issue of fact in a motion for change of venue by submitting affidavits which assert that a defendant can receive a fair trial in the forum county. This opinion recognized that Texas has changed since the inception of the rules concerning changes of venue. It is no longer reasonable to expect the State to find compurgators who have actual knowledge of a defendant's compurgators and their basis for knowledge. In today's more urban settings, it is sufficient for the State to merely present controverting evidence concerning the potential for a fair trial. *Id.* By implication, that holding necessarily stands for

---

granted or refused, as the law and facts shall warrant.

**3.** If a defendant properly files a motion for change of venue and the State fails to present controverting affidavits, the motion must, as a matter of law, be granted. E.g., *Fields v. State,* 627 S.W.2d 714, 719 (Tex.Cr.App.1982). Appellant argues that if the State's affidavits are struck, procedurally, this would be equivalent to a situation in which the State had filed no

affidavit. Thus, appellant argues, he was entitled to the change of venue as a matter of law.

**4.** This opinion does not address what consequences might result from the State's compurgators falsely swearing that they knew the appellant's compurgators and knew that their affidavits were unreliable. The only issue before us is the sufficiency of the State's affidavits to raise a factual issue.

the proposition that evidence which indicates that an appellant can receive a fair trial, if believed by the trial judge, is sufficient to defeat a motion for change of venue.

■ During the hearing on the motion to change venue, both of the State's witnesses testified that they believed that appellant could receive a fair trial in Bowie County, and cross examination of appellant's witnesses cast some doubt on the validity of those witnesses' opinions. In addition, the hearing was conducted after jury selection, giving the trial judge an additional barometer of community climate. See *Henley v. State*, 576 S.W.2d 66, 71 (Tex.Cr.App.1978). The standard of review for a trial judge's refusal to grant a motion for change of venue is abuse of discretion. *McManus*, supra at 516. Given the testimony of both defense and State's witnesses, the actual newspaper articles entered as exhibits, and the testimony adduced at voir dire, we hold that the trial court did not abuse its discretion. Appellant's second point of error is overruled.

In his third point of error, appellant argues that the judge committed reversible error by denying appellant's motion for separate and individual voir dire examination of the veniremen. Upon the trial judge's orders, the jury voir dire was conducted in a "bifurcated" procedure. Questions concerning certain subjects were to be asked during individual voir dire, and the remaining questions were to be asked during the voir dire of the entire panel.[5] Appellant argues that this procedure violates his "absolute" right to separate and individual voir dire as granted in Art. 35.-17(2) V.A.C.C.P. The State responds by arguing that appellant has failed to show that he was harmed by this procedure. We will begin by addressing this argument.

■ For cases in which an appellant challenges the jury voir dire process, as distinguished from appeals concerning the trial judge's failure to grant a specific challenge for cause, there is no requirement that appellant show harm. *Smith v. State*, 513 S.W.2d 823, 826 (Tex.Cr.App.1974). Such cases are reviewed under an abuse of discretion standard. The standard focuses on whether a question proffered by counsel and refused by the trial judge was proper. If the disallowed question was proper, harm is presumed because appellant has been denied the intelligent use of his peremptory strikes. *Smith v. State*, 703 S.W. 2d 641, 643 (Tex.Cr.App.1985); *Powell v. State* 631 S.W.2d 169, 170 (Tex.Cr.App. 1982). The State's contention that appellant must show harm is without merit.

Because this Court applies the abuse of discretion standard, set out above, for deciding appeals concerning the *manner* of voir dire, it is essential that the record present this Court with a question which the trial judge has not allowed to be answered. If counsel refrains, for what ever reason, from asking a question, the judge is denied the opportunity to make a ruling. Thus, we are unable to review the correctness of a ruling which was never made. *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Cr.App.1980); *Johnson v. State*, 447 S.W. 2d 927, 930 (Tex.Cr.App.1969). For appellant to have a cognizable point of error, the record must reflect a ruling which appellant wishes to challenge. See Tex.R.App. Pro. 52(a).

■ A careful review of the statement of facts reveals that, during individual jury voir dire, counsel for appellant asked questions on the State's burden of proof, the legal significance of the indictment, legal presumptions, attitudes arising from veniremen's prior experiences as crime victims, the difference between the meanings of "deliberate" and "intentional," and acquaintances with parties to the law suit, potential witnesses, and family members of these two groups.[6] In addition, every ve-

---

5. Although both parties agree that such a limitation was made by the trial judge and discussed the matter during oral argument, the record does not reflect the precise limits set by the trial court.

6. In *Faulder v. State*, 745 S.W.2d 327 (Tex.Cr. App.1987), the defendant raised as a point of error the trial judge's refusal to allow him to "jog" veniremen's memories as to a newspaper article which discussed that defendant's first capital murder trial and its subsequent reversal

niremen was examined on his or her views of the death penalty and prior knowledge of the case. The statement of facts does not reveal a single instance of the trial judge disallowing a question to any venireman.[7] Because the record does not reflect any refused questions, we cannot review that which does not exist—the trial judge's exercise of discretion. Appellant's third point of error is overruled.

In his fourth point of error, appellant contends that the trial court erred in overruling motions to excuse three veniremen for cause. We will address each venireman separately.

During individual voir dire, venireman Margaret Thornton stated that she would require appellant to bring forward some evidence in order to vote to acquit. Because of this statement, appellant contends that Thornton should have been excused for cause. The relevant portion of Ms. Thornton's examination states:

*By Mr. Malaby [Defense Counsel]:*

Q: You've heard that there was an offense committed, a lady was killed

A: Yes.

Q: And Mr. Cockrum stands charged with that crime, because of those factors would you require him to put on evidence to rebut that knowledge?

A: Yes, sir.

Q: You feel that because there are charges against him that he will have to do something to prove his innocence?

A: Yes, sir.

        *   *   *   *   *   *

Q: Okay, my question is, is that based on the fact that you have heard there was an offense committed, Mr. Cockrum is here in the Courtroom today, and he stands charged with the commission of that offense, based on that association; which you provided, would you require him to come forward with evidence to prove his innocence to disprove these associations?

A: I really don't understand what you mean.

Q: Okay, do you have a feeling that because he sits here charged with a crime that he may be guilty?

A: I really don't understand what you mean.

Q: Okay, do you have a feeling that because he sits here charged with a crime that he may be guilty?

A: No, sir, not really, no, sir.

Q: Alright, let's take a hypothetical example, let's say the State puts on their evidence, which they feel shows Mr. Cockrum committed the offense, if after having done that, would you re-

because of an improper confession. This Court overruled that point of error because the trial court's prohibition against refreshing the veniremen's memories was not a "hard and fast" rule. *Faulder,* supra at 337.

Whatever the scope of the trial judge's ruling in the instant case, it appears that appellant was afforded a wide range of permissible topics of inquiry.

7. The statement of facts does, however, indicate that several bench conferences occurred during the voir dire, but it is silent as to what transpired during these conferences. A hint is provided by the following exchange:

*Mr. Shumaker* [defense counsel]: [T]he Code [of Criminal Procedure article 35.17(2) ] says on demand of the State or the Defendant, either is entitled to examine each juror, individually, and separate and apart from the entire panel ...

*Judge Carter:* That's what you're getting to do.

*Mr. Shumaker:* ... well, and further question the juror in the principles propounded by the Court, and 35.17 sets for the the principles as, reasonable doubt, burden of proof, return of Indictment by Grand Jury, presumption of innocence and opinion ...

*Judge Carter:* Well, if you have something come up that you want to ask of these ...

*Mr. Shumaker:* Well, that's what I was getting into, Your Honor. Yesterday we got into this on burden of proof problems, and were instructed or told that we can stay away from that and don't get back into it.

Perhaps, one of the unrecorded bench conferences would have reflected that some question was prohibited by the trial judge. Such supposition on the part of this Court, however, cannot substitute for what has actually found its way into the appellate record. In addition, we note that appellant was allowed to question veniremen on both burden of proof and the significance of the indictment after the above exchange occurred.

quire them to put on evidence to prove his innocence?

A: What do you mean?

Q: Okay, say they put on their side with witnesses and other evidence?

A: Uh, huh (yes).

Q: And they say because of this we feel he did it, and the Judge has explained to you that it is their burden beyond a reasonable doubt, would you require Mr. Cockrum to put on evidence to rebut what they put on?

A: I think I would.

*Judge Carter:*

Q: Let me tell her about the instruction the Court is going to give her, do you understand.. I haven't covered this, but the Court will give you an instruction that the Defendant has a right to remain silent, and you understand that, don't you?

A: Yes.

Q: And that cannot be used against him, do you understand that?

A: Uh, huh (yes).

Q: If he decides to remain totally silent, that cannot be used against him, do you understand that?

A: Yes.

Q: And the Court will give you an instruction if that happens to be the case, could you follow that instruction?

A: Yes, sir.

Q: Can you follow that law?

A: Yes, sir.

*By Mr. Elliott [prosecutor]:*

Q: Ms. Thornton, nobody has explained the rules of our procedure here to you?

A: Uh, huh (yes).

Q: And you're not familiar with those?

A: No, sir.

Q: Did you understand that the rules don't require the Defendant in any criminal case to bring forth any evidence whatsoever?

A: Yes, sir.

Q: That the burden is totally on the State, and that means we have to produce the evidence?

A: Yes, sir.

Q: If the Judge tells you that he doesn't have to produce any evidence, can you follow that instruction?

A: Yes, sir.

Q: You can do that and follow the Court's instruction?

A: Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

*Judge Carter:*

Do you have any further questions, Mr. Malaby?

*By Mr. Malaby:*

Yes, sir.

Q: Ms. Thornton, I'm not trying to trick you, we need to be very careful to make our questions very clear...?

A: ... I think I know...

Q: ... and I may not be doing a very good job of that. You have been instructed on the presumption of innocence, my question is, if he doesn't put on any evidence, regardless of what the State does, would you hold that against him?

A: No, sir.

Q: You wouldn't necessarily find him guilty based on the fact that he doesn't respond to the charges?

A: No, sir.

A potential juror's initial disagreement with any phase of the law relevant to a case does not merit a per se excusal for cause. *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App.1985); *Smith v. State*, 573 S.W.2d 763 (Tex.Cr.App.1977); *Adami v. State*, 524 S.W.2d 693 (Tex.Cr.App.1975). Instead, further examination may reveal misapprehension of relevant substantive law, trial procedure, or even the meaning of counsels' questions. Ms. Thornton's testimony contains all three problems.

■ While her first answers to appellant's questioning indicated that Ms. Thornton would require that he put on some sort of evidence before she could vote to acquit, continued questioning revealed that she was often confused by counsels' complicated questions and unfamiliar with criminal procedure and what it requires of jurors. Once these factors were clarified to Ms. Thornton, she answered that she would

not, after all, place any burden of proof on appellant. Based on the totality of her examination, the trial judge found that Ms. Thornton's opinions would not impair her as a juror. This Court should generally defer to a trial judge's evaluations of a venireman's demeanor and credibility. *Wainwright v. Witt*, 469 U.S. 412, 429, 105 S.Ct. 844, 855, 83 L.Ed.2d 841, 855 (1985); *Phillips v. State* at 881. The appellate record shows ample support for the trial judge's refusal to excuse Ms. Thornton for cause. Finding that the trial judge did not abuse his discretion, this Court will not disturb his ruling.

Appellant also complains of the trial court's refusal to excuse venireman Marshall Stanley for cause. Appellant argues that, because he had prior knowledge of the case and had formed an opinion that appellant was guilty, he should have been excused for cause. Appellant argues that the voir dire indicates that Stanley had prior knowledge of the guilt of the defendant. See Art. 35.16(a) 10, V.A.C.C.P. The record shows, in relevant part, the following testimony:

*By Mr. Shumaker [defense counsel]:*

Q: Mr. Stanley, can you tell me what all you know about this case from the newspaper, the Texarkana Gazette, do you read the Citizen's Tribune?

A: Yes, I do read it.

Q: Have you read anything that had this [case] in it?

A: If I did I don't recall what it was, but I do read it.

Q: Can you tell me what you remember for the .. or what you do remember from whatever you read or heard about it?

A: Well, the particular thing that I recall was the headlines I believe in the Texarkana paper, which stated that there had been a Ms. May that was killed and that there had been two people arrested for the murder.

Q: Before yesterday, could you associate a name with any of these people who were arrested?

A: I recall the Cockrum name, but the other one I don't recall.

Q: Is there any reason that you recall Johnny's name as compared to the other one?

A: I guess because I have known a Cockrum, and it dawned on me that was the Cockrum name, and I do know a Cockrum. That's really all I remember other than what I read in Monday's paper, that there was going to be a trial.

Q: You read the article that ran in the Texarkana Gazette yesterday?

A: I sure did.

Q: Let me ask you this, the Judge asked you awhile ago if you had an opinion, and you said you didn't but right now if you were leaning either way as to guilty or innocent, which way do you think you would be leaning right now?

A: I would probably say he's guilty.

Q: Is that opinion that you probably think he is guilty based upon what you read in the Texarkana Gazette?

A: All probability, yes.

Q: It sounds good to be able [sic], but it would be hard to set that aside in that jury box, wouldn't it?

A: Well, if the evidence was proven that he was guilty, I would have to vote that he was guilty.

Q: Okay, there is still a chance that might affect you, isn't it, sir?

A: I don't think so.

Q: But you do have an opinion right now that he ..

A: .. based on what was in the paper, I do, because of the fact that they said the other man had already been sentenced.

Q: Your Honor, at this time I would have to challenge him for cause on his preconceived notions.

*Judge Carter:*

Q: You're saying, Mr. Stanley, that you do have an opinion then based on what you've read about this?

A: Based on what I read that the other man had turned State's evidence.

Q: You do have an opinion about this case?

A: I would think so.

Q: Any further questions?

\* \* \* \* \* \*

*By Mr. Elliott:*

Q: [I]f you are sworn to be a juror and you sit in this case, and the State fails to prove it's case, what would your verdict be?

A: Not guilty. If the State fails to prove the man is guilty, I would have to say he's not guilty [sic].

Q: And you understand, that's the correct answer .. you understand your opinion doesn't enter into that?

A: I understand that.

Q: You know if we're all pushed, we have an opinion one way or the other?

A: That's right.

Q: But you're telling us that you can base this case strictly and solely on the evidence that you hear and nothing else?

A: That is correct.

\* \* \* \* \* \*

*Judge Carter:*

Q: Mr. Stanley, you have said that you do have an opinion, do you feel like this opinion would affect your thinking or your deliberation if you are selected on a jury?

A: No, sir.

Q: You don't think it would?

A: No, sir.

Q: And do you feel like your opinion at the present time ... that it would require that any evidence be presented to overcome what you are thinking right now? In other words, would you require the Defense side of the case to prove anything to you?

A: No, sir.

Q: Would you require something?

A: No, sir.

Q: You would not require them to prove anything to you?

A: No, sir.

Q: Could you afford to the Defendant the presumption that he is innocent at this time, until there is evidence to prove that he is guilty?

A: That is correct.

\* \* \* \* \* \*

*Mr. Shumaker:*

Q: [K]nowing that your opinion right now is he's guilty, can you presume him being innocent?

A: If he was proven innocent, I could.

Q: Right now, can you presume him innocent?

A: No.

\* \* \* \* \* \*

*By Mr. Elliott:*

Q: Sir, nobody has explained the rules to you they, nobody has given you any instructions on how we will proceed in this case or any other criminal case, have they?

A: No.

Q: If the Judge instructs you through his Jury charge that you are to presume this Defendant innocent and that's what the law in the State of Texas imposes on each and every juror, can you do that pursuant to the Judge's instructions, could you do that?

A: Sure.

Q: Okay. You know the problem that we have is, you are being asked what's your opinion right now, well, you haven't heard any evidence, have you?

A: That's correct.

Q: Are you telling us that your opinion that you have is simply based on what you've heard as opposed to evidence?

A: That is correct.

Q: But you understand that the law requires that you set that aside and render your verdict based on the evidence, can you do that?

A: I did say that awhile ago.

Q: Okay, do you understand now what we're talking about with regard to rendering a verdict in a criminal case?

A: Sure I understand it.

Q: That it's based on evidence and you set your personal opinions aside?

A: That's right.

Q: And you're telling this Court and this Judge that you can do that?

A: That's right.

Q: Thank you, sir.

*Judge Carter:*

Q: Mr. Stanley, the only question that I've got is in answer to some of the questions you indicated that at the present time you could not presume the Defendant to be innocent, is that your answer?

A: That I could not presume him to be innocent?

Q: Innocent?

A: That's right.

Q: Until proven guilty?

A: That's right.

Q: You could not do that?

A: Well, sure I can say he's innocent until proven guilty, that's the law.

Q: Okay. Mr. Shumaker asked you that a few minutes ago, and he said, could you presume right now that the Defendant is innocent, can you do that?

A: I can. I said when I saw it in the paper I formed an opinion, at that time.

Q: Right. You've already told me about that and you said you don't think that would affect your deliberations?

A: I did say that. It would not affect my deliberation.

Q: My next question, but having this background information would that mean that you feel the Defendant would somehow have to prove something to you rather than the State having to prove the case?

A: No, sir.

Q: Are you telling me, or are you not telling me that you can presume that the Defendant is innocent until he is shown to be guilty by legal evidence beyond a reasonable doubt?

A: I'm saying that the way I feel, the man is innocent until the State has proven their case that he is guilty. I can vote he is innocent until they prove he is guilty.

Q: Now, you've not heard any evidence at all right now?

A: That's right.

Q: If you had to vote right this minute, what would your vote have to be?

A: No evidence, he would have to be not guilty.

Prior knowledge of a crime from the news media and community discussion is not sufficient grounds to require that a venireman be excused for cause. *Bell v. State,* 724 S.W.2d 780, 797 (Tex.Cr.App. 1986); *Nethery v. State,* 692 S.W.2d 686, 694 (Tex.Cr.App.1985); *Freeman v. State,* 556 S.W.2d 287, 293 (Tex.Cr.App.1977), cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794. The sole question for determination is whether a juror can put aside prior knowledge and opinion and render an impartial verdict.

The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* supra, 366 U.S. [717] at 722, 81 S.Ct. [1639] at 1642, [6 L.Ed.2d 751]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Id.,* at 723, 81 S.Ct. at 1642, 6 L.Ed.2d at 756.

*Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589, 594–595 (1975).

▆▆ Ultimately, Mr. Stanley stated that he would be able to follow the law, as given by the judge, and return an unbiased verdict. The trial judge was able to view Mr. Stanley and evaluate his demeanor and sincerity. *Wainwright v. Witt,* supra; *Phillips,* supra. Based on the testimony in the record, we find that the trial judge did not abuse his discretion in overruling appellant's motion to excuse Mr. Stanley for cause.

The final venireman challenged on appeal is Floyd Blankenship. Appellant argues

that the trial judge improperly qualified Mr. Blankenship as a juror despite, according to appellant's characterization, Blankenship's inability to consider life in prison as a punishment for capital murder.

Mr. Blankenship's individual voir dire examination reveals, in relevant part, the following:

*By Mr. Shumaker:*

Q: [W]hat is your view on the death penalty?

A: Sir?

Q: What is your view on the death penalty, or how do you view the death penalty?

\* \* \* \* \* \*

A: I feel like if a man commits a crime, a violent crime, and it would depend on the jury, I guess, but I feel like a violent crime, such as from what I understand about this case, then the death penalty is there ... you know.

Q: Do you think in crimes such as this, the way Mr. Elliott has told you what he is charged with, do you feel that is the only punishment you would agree to invoke?

A: I feel like if a man takes a gun or a weapon, or a club, an ax, whatever, and he robs, steals, kills somebody with that, then he has taken their life, and he does not have the right to live. Now, that's the way I feel about it.

Q: Okay, so ...

A: ... if I went out and robbed the bank, I am going to go in there with the idea that I'm going to get the money that I'm after, no matter what the cost is. If I kill somebody in the process it... you know .. it's wrong.

Q: So, basically, an eye for an eye, and a tooth for a tooth?

A: Something like that, right.

At this point, the sentencing procedure was explained to Mr. Blankenship. See Art. 37.071 V.A.C.C.P. After this explanation, appellant's attorney questioned Mr. Blankenship about how he would answer the special issues.

Q: So the question I need to ask you is, you have stated if somebody in a crime such as they have the Defendant charged with, if you were sitting on the jury that convicted them of that crime, then is what you're telling me, no matter what the evidence showed, you would vote 'yes' to all of these questions so that the death penalty would be invoked?

A: Think I would, yes, sir.

Q: Okay, you know that regardless of the evidence you would vote 'yes' to the questions?

A: If the State or the District Attorney proved beyond a shadow of a doubt ..

Q: .. okay, it's beyond a reasonable doubt ..

A: .. well, beyond a reasonable doubt .. you know .. that he committed a crime, whatever, then I think yes, I do.

Q: So you would automatically, if you were convinced he committed the crime as charged, you would automatically vote 'yes' to these questions, regardless of what the evidence showed?

A: I think I would.

Q: Now, we need a little bit more than 'I think' .. do you know you would?

A: Yes, sir, I would say I would, yes, sir.

*MR. SHUMAKER;*

Your Honor at this time I would challenge for cause on the basis of the testimony he has presented concerning the questions.

*MR. ELLIOTT;*

Very brief, Your Honor.

Q: Mr. Blankenship, we're giving you a short course in criminal law and procedure here.

A: I didn't even finish high school.

Q: Well, so far you're passing pretty good. Let me make sure you understand what we're saying with regard to those three questions. You understand the first part of the trial, the guilt-innocence part, whether you decide the man is guilty or innocent depends on evidence in the case, doesn't it?

A: Right.

Q: Then the same thing applies to the second part of the trial where you answer those three questions. Would you look at those three questions with me a second?

A: Yes, sir.

Q: Now, what Mr. Shumaker is asking you is, in spite of the lack of evidence, for example, with regard to Question No. 1, if there was no evidence on that point in this case, would you automatically vote 'yes' even though there were no evidence on that point?

A: No.

Q: Do you see what we're doing now? It's the State's burden, Mr. Blankenship, to prove this Defendant guilty beyond a reasonable doubt. If we do that, it also becomes our burden to produce evidence for you that these questions should be answered 'yes', and if we don't produce any evidence for you that these questions should be answered 'yes' then the law says they ought to be answered 'no.' Are you with me on that procedure?

A: The State has to prove that he did the crime?

Q: That's the first part of the Trial.

A: And they have got to prove, or should have proof that he committed the crime, that's the first part, and then the second part is whether he is guilty or innocent?

Q: Okay, that's the first part. Whether he did the crime will help you determine if he is guilty or innocent. If he did the crime, if we prove everything we say in this indictment, the verdict should be guilty?

A: Right.

Q: If we prove beyond reasonable doubt, if we don't prove it, the verdict is not guilty, okay?

A: (No audible response).

Q: Okay, if he's not guilty, we don't even get to punishment. We don't answer these questions. If he's guilty, then we go to the punishment phase and we consider these three questions. Let me put it this way. The State in this case, will want you to answer all of these questions, 'yes' ...

A: Uh, huh (yes).

Q: The Defense is point [sic] to want you to answer one or more of these questions 'no', okay?

A: (No audible response).

Q: It's like each of us is running a race by producing evidence. If I don't win the race, I shouldn't get the prize, the prize being the answer 'yes', are you with me on that?

A: Uh, huh (yes).

Q: the question is, even if I don't win the race, are you still going to give me the prize anyway?

A: No.

Q: Okay, are you with me now? Did I make that clear?

A: Yeah, I understand.

Q: When we give you ten minutes, and you get talked to by two lawyers, it's no wonder that people get confused. Do you see what I mean about producing evidence?

A: Uh, huh (yes).

Q: Before you answer these questions 'yes' you would require the State to prove to you beyond a reasonable doubt the answers should be 'yes'

A: Yes.

Q: You wouldn't just automatically answer them 'yes' just so he would get the death penalty?

A: No.

&ast; &ast; &ast; &ast; &ast; &ast;

*Judge Carter:*

Q: Now, when Mr. Shumaker was asking you questions awhile ago, you said something about you felt like you would automatically answer these questions 'yes' regardless if he is found guilty. Are you clear about that now?

Q: Well, let me say this. Maybe I didn't understand what he was asking.

Q: Alright. That's what I'm asking you now, you feel like you do understand it now?

A: Yes, sir, I do.

Q: And if it is not proven to you these three issues should be answered, 'yes', how would you answer them?

A: You would have to answer them 'no.'

Q: Would you do that?

A: Yes, sir, if the State didn't, and if I felt like in my own mind that didn't prove their case, and then I would have to say 'no.'

\* \* \* \* \* \*

*MR. SHUMAKER:*

I believe on the clarification and what I have tried to ask Mr. Blankenship, his answer is that he will require that the State produce and convince him beyond a reasonable doubt on both the punishment issue and the guilt or innocence. Let me just ask you this, Mr. Blankenship.

Q: Can you consider that in any case where a person is charged with intentionally committing murder while in the course of committing robbery, if that is found to be guilty, just assume that he is for a minute, can you not only consider the possibility of a death sentence, but also the possibility of a life sentence? Life in the penitentiary?

A: You're saying if the law says he could either get life or death penalty?

Q: Uh, huh (yes) ... consider both of them?

A: Could I consider a life sentence or a death sentence?

Q: Yes, sir.

A: Yeah, I think I could consider either one.

■ The standard for determining whether a potential juror should be excused for cause due to his views was set out in *Sharp v. State,* 707 S.W.2d 611 (Tex.Cr.App.1986). The operative question is whether a juror's views would "prevent or substantially impair the performance of

his duties as a juror in accordance with his instruction and oath." *Id.* at 620. Despite this venireman's initial statement that he would always vote "yes" on the special issues, after greater explanation of trial procedure and the State's burden of proof, he stated that he could answer the questions according to the evidence presented. The examination of Mr. Blankenship is similar to that of a venireman in *Barefoot v. State,* 596 S.W.2d 875, 883 (Tex.Cr.App. 1980). In *Barefoot,* a venireman was rehabilitated after being given a careful and more complete explanation of the sentencing procedure than that which produced the initial answer. See also *Cordova v. State,* 733 S.W.2d 175, 184 (Tex.Cr.App.1987); *Smith v. State,* 573 S.W.2d 763, 765 (Tex. Cr.App.1977); cf. *Pierce v. State,* 604 S.W. 2d 185, 186 (Tex.Cr.App.1980). We find that the trial judge, based on Mr. Blankenship's testimony, did not abuse his discretion in finding that this venireman could fairly apply the law applicable to this case and obey his oath as a juror. Appellant's fourth point of error is overruled.

■ In his fifth, and final, point of error, appellant argues that the evidence was insufficient to support the jury's affirmative answer to the second special issue. Art. 37.071(b)(2) V.A.C.C.P. In support of this contention appellant stresses the lack of evidence indicating that he has committed acts of violence before this offense and the absence of any psychiatric testimony. In addition, he urges this Court to note evidence introduced at the punishment phase that he is a good brother and son, that he has been a good prisoner, and that he has not committed prior acts of violence. Appellant likens these facts to those set out in *Keeton v. State,* 724 S.W.2d 58 (Tex. Cr.App.1987).[8]

The State argues that the evidence from both phases of appellant's trial are sufficient to support an affirmative answer to

---

8. In *Keeton* this Court reformed the defendant's death sentence to life imprisonment because the evidence was insufficient to prove appellant to be a continuing threat to society. The greatest distinction between *Keeton* and the instant case lies with appellant's criminal record. The defendant in *Keeton* had his probation for posses-

sion of marihuana revoked. Appellant shares a marihuana conviction with the *Keeton* defendant. In addition appellant had convictions for burglary and attempted burglary of a habitation. These additional convictions are sufficient to distinguish these two cases.

the second special issue. The State urges a number of factors in support of this contention: an absence of duress, planning of the crime and procurement of a weapon, hiding evidence, attempts to evade law enforcement, probated sentences for burglary of a building and attempted burglary of a habitation, and a felony conviction for possession of marihuana. In addition to these factors raised by the State in its brief, there was evidence introduced as to appellant's bad reputation as a peaceful, law-abiding citizen.

In answering the special issues in a capital case, the jury may consider all evidence adduced at both phases of the trial. E.g., *Keeton,* supra at 61; *Santana v. State,* 714 S.W.2d 1, 8 (Tex.Cr.App.1986).

The jury is permitted to consider many factors when determining whether the defendant will pose a continuing threat of violence to society. Those factors include, but are not limited to:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence; and

8. character evidence.

*Keeton,* supra at 61; see also cases cited therein.

Evidence that a defendant planned a crime in advance and made preparations is proper evidence in support of an affirmative answer to the second special issue. *Livingston v. State,* 739 S.W.2d 311, 340

(Tex.Cr.App.1987); *Keeton,* supra at 61. The evidence from the guilt/innocence stage of this trial suggests the presence of this aggravating factor. Appellant, according to the testimony of Morgan, was the only person who entered the store. He was, according to Thom's testimony, the only one who carried a gun away from the ranch. In fact, Morgan made a conscious decision not to take his gun to the crime scene. Appellant, however, carried his weapon to the crime scene. This, and other evidence, suggests that appellant's was the dominant role in the commission of this offense.

Reputation evidence is relevant on the issue of future dangerousness. *Rougeau v. State,* 738 S.W.2d 651, 668 (Tex.Cr.App. 1987); *Keeton,* supra at 61. Two law enforcement officers testified that appellant had a bad reputation within the community. In contrast, appellant's two sisters and his mother testified that he was a good brother and son. In addition, a correctional officer at the facility in which appellant was held prior to trial testified that appellant had been a "good" prisoner. Based on the totality of this, and other, evidence, a rational trier of fact could have concluded that appellant's reputation and character were bad. If so, this conclusion would properly militate in favor of an affirmative answer.

A defendant's prior criminal record is relevant to future dangerousness. *Keeton,* supra at 61; *Brasfield v. State,* 600 S.W.2d 288, 293 n. 3 (Tex.Cr.App.1980). Appellant's probation officer testified as to appellant's three felony convictions. Appellant argues that none of these convictions involved acts of violence. We would agree with appellant's contention as to the marihuana conviction. We must, however, disagree with regard to the two burglary related offenses. Burglary provides an inherent potential to escalate into violence, and the second conviction, attempted burglary of a *habitation,* provides a particularly high potential for violence.[9] The legislature has acknowledged the reality of

---

9. We do not hold that burglary is, per se, a "felony involving an act of violence or threatened violence" within the meaning of V.T.C.A.

Penal Code, § 46.05. This discussion is intended only to suggest that acts of burglary are probative on the issue of future dangerousness.

this threat by grouping burglary of a habitation with burglary while armed with a deadly weapon and causing injury to a person while in the course of committing burglary as aggravating elements. V.T.C.A. Penal Code, § 30.02(d). A rational jury could well interpret these prior offenses as inherently dangerous practices, fraught with potentially life-threatening possibilities.

When reviewing the sufficiency of evidence to support an affirmative answer to the second special issue, this Court must view the evidence in the light most favorable to the verdict to determine whether "a rational trier of fact could have found the elements of Art. 37.071(b)(2), supra, beyond a reasonable doubt. *Keeton*, supra at 61. In light of our above discussion, we find that a rational trier of fact could have answered the second special issue affirmatively. Appellant's fifth point of error is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., dissents to overruling the fifth (5) point of error.

TEAGUE, J., dissents to fourth (4) point of error as to Juror Stanley.