IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-10-00386-CV

 

Neptune Marine Services,

                                                                                    Appellant

 v.

 

Christina Gibson, 

Beverly Peplinski, 

and Kristian Fulwood,

                                                                                    Appellees

 

 

 



From the 18th District
Court

Johnson County, Texas

Trial Court No. C200800391

 



MEMORANDUM Opinion



 

Appellant, Neptune Marine Services, and
Appellees, Christina Gibson, Beverly Peplinski, and Kristina Fullwood have
filed a joint motion to dismiss the appeal.  See Tex. R. App. P. 42.1(a)(2).  The parties have entered into a
settlement agreement and no longer wish to pursue the appeal.  Dismissal of
this appeal would not prevent a party from seeking relief to which it would
otherwise be entitled.  The motion is granted, and the appeal is dismissed.

 

 

 

                                                                        AL
SCOGGINS

                                                                        Justice

 

Before
Chief Justice Gray,

            Justice
Davis, and

            Justice
Scoggins

Motion
granted; appeal dismissed

Opinion
delivered and filed April 20, 2011

[CV06]









 






4pt">                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      A jury convicted Melvin Bradley of capital murder. Because the State did not seek the death
penalty, the court assessed his punishment at life imprisonment. Bradley claims in two points that:
(1) there is insufficient evidence to corroborate the accomplice testimony offered by the State; and
(2) the court abused its discretion by refusing to allow him to cross-examine a witness with
evidence that the witness changed his statement after failing a polygraph examination and did not
have to submit to another polygraph examination after providing a second statement which was
more favorable to the State’s theory of the case.
BACKGROUND
      The indictment alleges that Bradley fatally shot Dedrick Webber “on or about” October 6,
1997 while “in the course of committing and attempting to commit the offense of robbery.” The
record reflects that Webber was a used car dealer from Tennessee who had come to Waco to
purchase some vehicles at an auction. Bradley’s sister Valerie and others helped Webber drive
the vehicles from the auction lot to the Bradley home until he could find enough drivers to take
the cars to Tennessee.
      Valerie testified that she overheard a conversation between Bradley and Lance Alexander in
Bradley’s bedroom on the date in question. Alexander told Bradley that Steve Kelly and he “had
something to take care of.” When Valerie looked in the bedroom, she saw a handgun beside
Bradley on his bed. Alexander took the gun. In a videotaped statement Valerie gave to a detective
during the investigation of Webber’s murder, Valerie stated that Bradley pointed the gun toward
the ceiling saying, “This nigger got to go; this nigger got to go.” At trial, Valerie denied that she
ever saw Bradley holding the gun. She attributed the statement to Alexander. The State offered
Valerie’s videotaped statement in evidence and played this portion of it for the jury as
impeachment evidence.
      Valerie testified that Kelly, Alexander, Bradley, and Webber left the house together in
Webber’s van. Kelly drove; Alexander and Webber rode in the back; Bradley rode in the front
passenger seat. Valerie told Webber not to go with Kelly “and them” because they intended to
kill him.


 In her videotaped statement, she said that she “almost pulled” Bradley out of the van
and he warned her, “You say something, someone will kill you, too.” At trial, she testified that
she could not tell which of them had threatened her.
      Alexander testified that Bradley asked him to fix his .22 caliber handgun. According to
Alexander, the gun “was broken where you could see the clip slid into—into the gun” and it was
“jammed.” Webber asked Alexander and Bradley to go with him to find some drivers. They met
Kelly outside and left together in the van. Alexander confirmed Valerie’s testimony regarding
their initial seating in the van. At some point, Webber and Kelly traded places because Webber
did not like the way Kelly was driving. According to Alexander, Webber and Kelly had a brief
argument about Kelly’s driving. Webber told Kelly that if he was going to act “wild and crazy”
that he had “some friends that can take care of his problem for him.”
      They went to the home of a mechanic whom Webber wanted to try to enlist to drive a pickup
to Tennessee for him. When Webber left the van, Bradley turned to Alexander and Kelly and
said, “[L]et’s get him before he gets us.” They agreed to take Webber to Cameron Park and shoot
him. Webber rejoined them, and Bradley directed him to the park. When they came to a dead
end, Webber began backing up to turn around. According to a pre-arranged signal, Kelly
“nudged” Alexander who shot Webber in the head. He tossed the gun to Bradley who shot
Webber in the face.
      After killing Webber, they took his watch, money, and the keys to his other vehicles then
dumped his body in an isolated area of the park. They saw Alexander’s grandmother and aunt a
few blocks from the park. They decided to burn the van to destroy any evidence.


 They took the
van to another location where they doused it with gasoline and set it on fire. Someone else gave
Bradley a ride to his house to get another vehicle. Alexander and Kelly ran to a nearby apartment
complex and Bradley picked them up in a Suburban owned by Webber. Bradley asked them to
come to his house and help him move Webber’s vehicles. Bradley distributed keys to two of the
vehicles, and Alexander and Kelly drove them away from the Bradley home.
      Kelly’s testimony largely corresponds to Alexander’s. He confirmed that Webber did not like
the way he was driving. However, he recalled that an argument with Webber ensued when
Bradley expressed displeasure because Webber had not paid his mother to park the vehicles at her
house. Kelly testified that Webber told Bradley, “Man, don’t make me have to get my boys on
you.”
      When Valerie returned later in the day, she “knew” they had killed Webber because
“everybody was crying and the cars were moved.” Valerie testified that she later saw Bradley,
Alexander, and Kelly return to the Bradley home together in a vehicle which she “think[s]” was
Webber’s Suburban. She did not recall who was driving.
      Law enforcement officers recovered Webber’s body in the park three days later. The Waco
Fire Marshal testified that the department responded to a fire on the date in question and in the
area identified by Alexander and Kelly. His investigation of the scene revealed a van which had
been almost completely destroyed by fire. A medical examiner testified that Webber died because
of a gunshot which entered his body near the left eye. She also noted a laceration to his right ear
which could have been caused by a gunshot.
      The officers identified Bradley, Alexander and Kelly as suspects and secured warrants for
their arrest. They arrested them in a motel room on October 23. The State indicted all three for
capital murder. The State obtained a dismissal of the Alexander indictment after he pleaded guilty
to aggravated assault and received a fifteen-year sentence. The State obtained a dismissal of the
Kelly indictment after he pleaded guilty to arson in exchange for a twenty-year sentence. The
court charged the jury in Bradley’s case that Alexander and Kelly were accomplices as a matter
of law.
CORROBORATION OF ACCOMPLICE TESTIMONY
      Bradley contends in his first point that the State produced insufficient evidence to corroborate
the testimony of his accomplices. Under article 38.14 of the Code of Criminal Procedure, a
conviction cannot rest on accomplice testimony unless that testimony is corroborated by other
evidence which tends to connect the defendant with the offense. See Tex. Code Crim. Proc.
Ann. art. 38.14 (Vernon 1979); Cathey v. State, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999),
cert. denied, 528 U.S. 1082, 120 S. Ct. 805, 145 L. Ed. 2d 678 (2000). The corroborating
evidence need not directly connect the defendant to the crime or suffice by itself to establish his
guilt. See Cathey, 992 S.W.2d at 462. Rather, “it need only tend to connect the defendant to the
offense. If the combined weight of the non-accomplice evidence tends to connect the defendant
to the offense, the requirement of Article 38.14 has been fulfilled.” Id. (citations omitted). 
      The question of whether sufficient corroborative evidence exists does not invoke the
traditional legal and factual sufficiency analyses. Id. Rather, “[t]he accomplice witness rule is
a statutorily imposed sufficiency review and is not derived from federal or state constitutional
principles that define the legal and factual sufficiency standards.” Id. at 462-63.
      The State claims that the record contains the following non-accomplice evidence which
suffices to corroborate the accomplices’ testimony: (1) the offense was committed; (2) Bradley was
seen with his accomplices shortly before and after the commission of the offense; (3) Bradley
possessed a handgun similar to the murder weapon; (4) Bradley had a motive to rob Webber; (5)
Bradley and his accomplices hastily moved Webber’s vehicles away from the Bradley home; and
(6) Bradley and his accomplices were found “hiding” in a motel room after the commission of the
offense.
      The State presented ample non-accomplice evidence to prove that Webber was murdered and
robbed. Non-accomplice proof of the commission of the offense can be considered with other
evidence to determine whether the record contains sufficient corroborative evidence. See Reed
v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).
      The record contains considerable non-accomplice testimony placing Bradley with his
accomplices and Webber shortly before the commission of the offense and with his accomplices
in Webber’s van not long after the commission of the offense and not far from the site of the
offense. Such evidence adds to the weight of the corroborative evidence. See Burks v. State, 876
S.W.2d 877, 887-88 (Tex. Crim. App. 1994); Reed, 744 S.W.2d at 127; McDuff v. State, 943
S.W.2d 517, 522 (Tex. App.—Austin 1997, pet. ref’d).
      Valerie’s testimony places Bradley in possession of a weapon similar to that used in the
commission of the offense shortly before the commission of the offense. “Proof that connects
appellant to a weapon similar to that used in the offense is another circumstance to be considered
when determining the sufficiency of evidence to corroborate the accomplice.” Hernandez v. State,
939 S.W.2d 173, 178 (Tex. Crim. App. 1997) (emphasis added); accord Cockrum v. State, 758
S.W.2d 577, 582 (Tex. Crim. App. 1988); Burks, 876 S.W.2d at 888.
      The State cites a portion of Valerie’s testimony as evidence that Bradley had a motive to kill
Webber. Apparently, the State refers to Valerie’s affirmative answer to the following question
from the prosecutor: “Did you tell them that they were all wrong for killing that boy over his
own—” We do not consider this sufficient to constitute any evidence of motive.
      The State similarly references part of Valerie’s testimony and that of her mother as evidence
that Bradley had helped move Webber’s other vehicles from the premises and had been driving
his Suburban. However, Valerie could not recall who was driving when she saw Bradley and his
accomplices return in what she “think[s]” was Webber’s Suburban. Her mother likewise did not
recall seeing Bradley drive anything. Accordingly, this testimony does not show that Bradley
participated in driving any of Webber’s vehicles.
      Finally, the State refers to law enforcement testimony that Bradley and his accomplices were
arrested in a motel room seventeen days after the commission of the offense. Evidence of flight
can be a corroborating circumstance because it demonstrates consciousness of guilt. See
Hernandez, 939 S.W.2d at 178; Burks, 876 S.W.2d at 888; Cockrum, 758 S.W.2d at 582;
McDuff, 943 S.W.2d at 522-23. The Cockrum case similarly involves a defendant found “hiding
out” in a motel room.


 See Cockrum, 758 S.W.2d at 582.
      The non-accomplice evidence: (1) shows the commission of the offense; (2) places Bradley
with his accomplices shortly before and after the commission of the offense; (3) places Bradley
in possession of a handgun similar to the murder weapon; and (4) suggests that Bradley and his
accomplices were attempting to evade detection by law enforcement officials. Although this
corroborative evidence cannot be characterized as overwhelming, we nevertheless conclude that
its cumulative weight sufficiently “tends to connect” Bradley to the offense to satisfy article 38.14. 
See Cathey, 992 S.W.2d at 462. Accordingly, we overrule Bradley’s first point.
POLYGRAPH EVIDENCE
      Bradley argues in his second point that the court abused its discretion when it refused to allow
him “to cross-examine Alexander with evidence that he changed his testimony after failing a
polygraph and did not have to take another polygraph after giving a second statement.”
      According to the testimony, Alexander gave a statement to a detective shortly after his arrest. 
He told the detective that Kelly fired the first shot rather than himself. The detective later had
Alexander submit to a polygraph examination. Apparently his performance on this examination
indicated deception. Alexander provided a second statement a few weeks before trial. This
statement more closely corresponds to his trial testimony. The detective did not require a
polygraph examination after Alexander gave his second statement.
      Bradley cites one Texas case and several decisions from other states to support his argument
that the fact that a second polygraph was not required should be admitted to impeach Alexander’s
testimony. His Texas authority is Long v. State, in which the Fourteenth Court of Appeals
considered an appellate point alleging ineffective assistance of counsel for failure to object to an
officer’s testimony that a co-defendant refused to take a polygraph after initially agreeing to do
so. 770 S.W.2d 27, 30 (Tex. App.—Houston [14th Dist.] 1989), rev’d, 800 S.W.2d 545 (Tex.
Crim. App. 1990) (per curiam). The Court addressed this point as follows:
The results of polygraph tests are inadmissible for any purpose. Nethery v. State,
692 S.W.2d 686 (Tex. Crim. App.1985) (en banc), cert. denied, 474 U.S. 1110, 106 S.
Ct. 897, 88 L. Ed. 2d 931 (1986). Relying on this principle, the Texarkana Court of
Appeals held evidence inadmissible if it even implies that a polygraph test was taken if
the evidence effectively impeaches the defendant's testimony or defensive theory or if the
evidence bolsters the State's case. Stewart v. State, 705 S.W.2d 232 (Tex.
App.—Texarkana 1986, pet. ref'd). The evidence of which appellant complains did not
concern polygraph test results. Nor did it concern the defendant but the codefendant to
whom the appellant attempted to shift criminal responsibility for the offense. Therefore,
it did not bolster the State's case. If anything, the allegedly objectionable testimony
effectively bolstered appellant's own defensive theory. Accordingly, trial strategy readily
explains trial counsel's failure to object.

Id. at 30. The Court of Criminal Appeals reversed the lower court’s decision on a different
ground. See Long v. State, 800 S.W.2d 545, 548 (Tex. Crim. App. 1990) (reversing on unrelated
preservation issue).
      The Court of Criminal Appeals has held that a court commits error by admitting testimony
regarding a polygraph examination which “lend[s a witness’s] testimony more credibility.” 
Tennard v. State, 802 S.W.2d 678, 684 (Tex. Crim. App. 1990). Bradley sought to introduce
testimony that a second polygraph was not required of Alexander in an effort to discredit his trial
testimony. Although the facts of this case are different from those presented in Tennard, we
nevertheless conclude that no abuse of discretion is shown.


 In addition to the general prohibition
on polygraph-related evidence, this conclusion finds support in the fact that Bradley had numerous
other avenues available to him to impeach Alexander’s testimony. Accordingly, we overrule
Bradley’s second point.
      We affirm the judgment.
 
                                                                   REX D. DAVIS
                                                                   Chief Justice

Before Chief Justice Davis
            Justice Vance and
            Justice Gray
Affirmed
Opinion delivered and filed May 30, 2001
Publish