NUMBER 13-01-595-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG







MATTHEW LEE SALAZAR
, Appellant,


v.



THE STATE OF TEXAS, Appellee.





On appeal from the 24th District Court


of Calhoun County, Texas.






MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Rodriguez and Castillo


Opinion by Justice Castillo



 The State of Texas charged Matthew Lee Salazar with the murder of twenty-three-year-old Christopher John Vasquez. (1) A jury convicted Salazar and sentenced him
to seventy-seven years in prison. By two issues, Salazar contends the trial court
abused its discretion in: (1) admitting an accomplice's admission against interest into
evidence without sufficient corroboration of its trustworthiness; and (2) denying his
motion for directed verdict without sufficient corroboration of a second accomplice's
testimony. We affirm. 

I. APPLICABLE APPELLATE RULES


 On August 26, 2001, Salazar filed a timely notice of appeal. The rules of
appellate procedure governing how appeals proceed in criminal cases were amended
effective January 1, 2003. Generally, rules altering procedure do not fall within the
prohibition in the Texas Constitution against retroactive application of laws that disturb
vested, substantive rights. See Tex. Const. art. I, § 16; see also Ibarra v. State,
11 S.W.3d 189, 192 (Tex. Crim. App. 1999). Therefore, this Court applies the
current rules of appellate procedure to this appeal. We may not affirm or reverse a
judgment or dismiss an appeal for formal defects or irregularities in appellate procedure
without allowing a reasonable time to correct or amend the defects or irregularities. 
Tex. R. App. P. 44.3. We also are prohibited from affirming or reversing a judgment
or dismissing an appeal if the record prevents the proper presentation of an appeal and
can be corrected by the trial court. Tex. R. App. P. 44.4(a). Accordingly, we abated
the appeal on July 22, 2003 and ordered a supplemental record to include, in
compliance with rule 25.2(a)(2), the trial court's certification of Salazar's right of
appeal. See Tex. R. App. P. 25.2(a)(2). We received a supplemental record on
July 30, 2003 that includes the trial court's certification of Salazar's right of appeal. 
We now turn to the merits. 

II. RELEVANT FACTS


 This is a memorandum opinion not designated for publication. The parties are
familiar with the facts. We will not recite them here except as necessary to advise the
parties of our decision and the basic reasons for it. See Tex. R. App. P. 47.4.

A. Non-Accomplice Testimony

 The jury heard that Vasquez owed a $300 drug debt to a man named Jimmy
Delgado. Knowing Delgado wanted payment and was looking for him, Vasquez left
Victoria, Texas to get away from the drug dealer. He moved in with his girlfriend April
Hinojosa in nearby Port Lavaca. Hilburn Hisquierdo told the jury he was at home in
Port Lavaca the morning of Friday, March 31, 2000. Around 9:00 or 10:00, a man
Hisquierdo knew as Michael D. Martinez, accompanied by three other men, arrived in
a Cadillac at Hisquierdo's house. Hisquierdo went for a drive in the Cadillac with
Martinez and the others. By the time of trial, Hisquierdo could not identify the other
men. The men cruised around and smoked marijuana. Martinez asked Hisquierdo
where Vasquez lived. Hisquierdo pointed out where Vasquez was living with April
Hinojosa. Martinez then drove Hisquierdo home. 

 Vasquez had told April Hinojosa the week before that he owed Delgado money
and was going to have to pay him. Along with April Hinojosa and Vasquez, April's
sister Jaclyn and their brother Ramon were at the house the morning of March 31. 
Ramon Hinojosa testified that at about 10:00, a dark-colored Cadillac, which looked
black in the shade, pulled up to the house. A man got out of the car and approached
the house. He knocked on the front door and announced, "Tell Vasquez his home boy,
Jimmy Delgado" was there. Jaclyn Hinojosa went to get Vasquez. He came to the
door. After stepping outside and talking with Delgado, Vasquez went back in the
house to change clothes. He told April Hinojosa he did not want to go, but if he did
not "they would do something to him." To avoid it happening there, he told her, he
was going to go with them. As he was leaving, he instructed April that if he was not
back in an hour-and-a-half to call the police and tell them he was with Jimmy Delgado. 
She asked if he was "for real." Vasquez confirmed he was. 

 Ramon Hinojosa testified he watched Vasquez climb in the back seat of the
Cadillac. Delgado sat in the front passenger seat. Another man, who had been
standing in the front yard while Delgado waited for Vasquez, was the driver. Raymond
Hinojosa was unable to see any other passengers in the car because of its tinted
windows. 

 An hour-and-a-half passed. April Hinojosa called Vasquez's mother, who told
her to call the police. She did. 

 Meanwhile, Laura Villarreal testified, she arrived at her ailing father's home in
Port Lavaca the morning of March 31. About 10:00, as was their custom, she drove
him to Magnolia Beach. On the way, she noticed that a dark-colored Cadillac followed
too close behind her car. She turned left. The Cadillac continued straight. She drove
past the LaSalle Monument, between Indianola and Magnolia Beach. No one was
there. 

 Around 11:00 a.m., Delbert Woods testified, his wife Dorothy and he drove by
the LaSalle Monument on the way to the grocery store. As they neared the beach,
they noticed a bronze-colored Cadillac parked near a picnic area. He saw three
Hispanic men. One was walking toward another, who was sitting on the picnic table,
and the third was "down below the hill." On the Woods' return trip, between 11:45
and 12:45, the men and the Cadillac were gone. Between 10:15 and 10:30 that
morning, Dorothy Woods testified, her husband and she were traveling to Port Lavaca
from Indianola, a route that took them past the LaSalle Monument. At the monument
site, she noticed three well-dressed men at a picnic table. A Cadillac was parked
nearby. 

 Trina Stanfield, a records administrator with the Port Lavaca Police Department,
testified she received a dispatch call that morning at 11:49. April Hinojosa told her,
Stanfield testified, that two men had come to her house, spoken with her boyfriend,
and tried to create a disturbance. Her boyfriend had gone "back into the residence and
told April that he was going to go leave with them so that there was not a disturbance
starting at the residence and that if he was not back within an hour-and-a-half to call
the police." April Hinojosa provided the name "Jimmy Delgado" and described the car
as a black Cadillac with shiny rims. 

 Around 1:00 or 1:30 that afternoon, Della Johnson and her husband were
walking on the beach near the LaSalle Monument. Her husband found a tennis shoe
in the water and retrieved it, thinking someone might have lost it. He laid the shoe on
the beach, turned around, and saw a body in the water. The Johnsons called the
police. 

 At 1:13 p.m., Bryan Redding, a Calhoun County deputy sheriff, was dispatched
to the scene. He arrived at 1:24. He spotted a body face-down on the beach, close
to the water's edge. The body had multiple stab wounds. April Hinojosa identified the
body as Vasquez's. Investigators recovered a blood-splattered gold nugget bracelet
at the scene, near some bloody rocks. 

 Roman Goodwine, a Victoria County deputy sheriff, testified that he was
dispatched on April 1, 2000 to a scene involving clothes on fire under a bridge along
a county road southwest of the Victoria city limits. The fire was out when he got
there. He retrieved a partially burned lace-up shoe or boot, white socks, khaki Dickies,
belted white sport pants, boxer shorts, a large white muscle shirt, and a Tool Techs
brown tee shirt with "La Vida Loca" on the back. Lisa Baylor, a forensic serologist,
testified she found no blood on the partially burned clothing. 

 Two special agents with the Federal Bureau of Investigation, Chris Cole and
Gregory Kuntz, testified that in January of 2000, a federal grand jury had indicted
Martinez, identified by Hisquierdo as the driver of the Cadillac who had picked him up
the morning of March 31, for drug distribution. A warrant issued for his arrest. On
April 6, 2000, the agents arrested Martinez. Martinez cooperated with the federal
authorities. He confessed his involvement in a number of crimes, including Vasquez's
murder. He implicated three other men and provided details of the crime. Martinez
originally told the federal authorities that the car used in Vasquez's murder belonged
to his girlfriend, but later admitted that he had driven the men to Port Lavaca that
morning in his mother's Cadillac. 

 The authorities impounded the car, a bronze-colored Cadillac that had been
concealed under a tarp at the scene of Martinez's arrest. "All the cops in Victoria
knew that car," Martinez explained. The authorities searched the Cadillac for trace
evidence. Fabric from the right rear passenger door tested positive for human blood. 
Baylor testified that forensic tests determined that the DNA profile of the blood in the
car was consistent with Salazar's, and Salazar could not be excluded as the donor. 
Baylor also told the jury that other forensic tests determined that the blood on the gold
nugget bracelet found at the scene was consistent with Vasquez's DNA profile. 

 Local investigators and federal agents testified that Martinez assisted in a search
for the weapons used in Vasquez's murder. With Martinez's assistance, investigating
officers recovered a butcher knife with a wooden handle wrapped in black electrical
tape. Baylor testified she found no blood on the butcher knife. Despite a thorough
search, the authorities were unable to locate a green folding knife that Martinez
informed them also was used in the murder. 

 Martinez told the authorities that he was a member of a highly structured group
of individuals with bonds forged in the Texas prison system. (2) This cadre (3) of felons
maintained their ties when released from prison, Cole informed the jury. He testified
that the cadre is known to participate in violent crime and drug trafficking. 

B. Accomplice Testimony


 Martinez testified at trial on behalf of the State. He implicated Delgado and
Salazar in Vasquez's murder, along with himself and a fourth man named Amador
Anzualda. The jury learned that Delgado, Salazar, Anzualda, and Martinez were
members of the cadre. Martinez described Delgado as a "ranking member" whose
orders he was required to follow by the cadre's code of discipline. 

 On March 31, 2000, about 8:00 a.m., Martinez told the jury, Delgado, Salazar,
and Anzualda came to his home. They appeared drunk and high on cocaine. They
decided to go to Port Lavaca to see Victor Villarreal, another member of the cadre. 
Martinez knew federal authorities were looking for him and did not want to risk being
pulled over. He insisted on driving. Martinez drove Delgado, Salazar, and Anzualda
to Port Lavaca in his mother's Cadillac. Salazar had not ridden in the Cadillac before
that day. 

 The men first tried to find Villarreal, who was not home. Searching next for
Vasquez, they looked up Hisquierdo, who showed them where Vasquez lived. They
dropped Hisquierdo back home and returned to Vasquez's house. Delgado sat in the
front passenger seat, Salazar sat behind him, and Anzualda sat behind Martinez. They
arrived at Vasquez's house. Delgado and Salazar got out of the Cadillac. Delgado
went to the door. Vasquez came out of the house and spoke with Delgado. After
going back inside and changing clothes, Vasquez got in the back seat of the Cadillac,
between Salazar and Anzualda. It was about 9:45 a.m. Martinez stopped at a
convenience store for gas. They bought beer. 

 Martinez drove toward Magnolia Beach. On the way, he testified, Delgado tore
a piece off the beer carton and wrote a note to Martinez, telling him to go "somewhere 
where - nowhere we could be seen to beat [Vasquez] up real bad and leave him
there." 

 They arrived at the LaSalle Monument about 10:00 or 10:15 a.m. Martinez
parked the Cadillac near a park bench. The five men got out of the car. Delgado and
Anzualda went into the bushes. Delgado said something to Anzualda that Martinez
could not hear. Delgado and Anzualda returned. Martinez "knew something was
going to happen" and decided to move the car away from the scene. The other men
walked to where he had moved the car anyway. Delgado distracted Vasquez's
attention toward the LaSalle Monument. He swung a beer bottle and tried to hit
Vasquez in the head. Vasquez put one hand up to block the blow. The other men
rushed Vasquez. Anzualda pulled a knife and attacked him. He stabbed him
repeatedly. 

 Vasquez pleaded for his life. Delgado said to get Vasquez's wallet. Someone
handed the wallet to Martinez. He handed it to Delgado. When Vasquez lost
consciousness, Martinez and either Anzualda or Salazar dragged the body from the
road over the rocks. Vasquez regained consciousness. Martinez punched him. 
Vasquez fell again. Salazar started stabbing him repeatedly. Vasquez lost
consciousness again. 

 Delgado ordered the others to pull Vasquez into some bushes. He observed that
the body still could be seen from passing cars. He suggested they put Vasquez in the
trunk of the Cadillac. Martinez told the jury he refused. Delgado "went over there to
go pull the body by himself towards the bushes some more to hide the body." As
Delgado did so, Martinez testified, Vasquez "jumped up and ran into the water" to get
away. At Delgado's order, Salazar and Anzualda followed Vasquez. Salazar stabbed
Vasquez some more. From the beach, Delgado shouted instructions to Salazar and
Anzualda to stab Vasquez in the neck, to cut his throat. 

 Salazar and Anzualda returned to shore. Vasquez remained on his feet in the
water. Martinez testified he convinced the others to leave, arguing that someone in
a passing car might see them. Delgado instructed them to pick up all the beer bottles,
so they would not leave any fingerprints. They did so. The four men got back in the
Cadillac. Vasquez began to wade ashore. As they were leaving, Delgado said, "Stop,
let me go show y'all how to do this right." He climbed out and pulled a knife from his
waistband. 

 Delgado waded into the water, Martinez told the jury. He stabbed Vasquez
twice in the back. He grabbed Vasquez's hair and dragged his head under water. He
quickly slit the man's throat, then slit it again. He left Vasquez floating in the water
and returned to the Cadillac. 

 The four men resumed their earlier seating positions. Martinez drove. Delgado
sat in the front passenger seat. Anzualda sat in the left rear passenger seat. Salazar
sat behind Delgado in the right rear passenger seat. Delgado repeated to the other
men that Vasquez had told him, "Just go ahead and kill me, finish me off." Delgado
said he replied, "You don't have to worry about it, that's already going to happen." 

 Delgado, however, proved no more successful than Martinez, Salazar, and
Anzualda. Vasquez did not die from being hit in the head with a beer bottle, beaten,
stabbed, or having his throat cut. Medical examiner Roberto J. Bayardo testified that
Vasquez had sustained a laceration to the back of his head, caused by blunt force, as
well as seventy-seven cuts and stab wounds throughout his body. His injuries
included slashes on his face and neck and multiple defensive wounds on his hands,
forearms, and one knee. Even so, Dr. Bayardo told the jury, the wounds would not
have killed Vasquez immediately. They would have taken about thirty minutes. 
Vasquez's airways were packed with sand and particles of seashell and seawater, the
medical examiner testified. Vasquez did not bleed to death. He drowned. 

 As they drove back to Victoria, Martinez told the jury, Delgado asked if anyone
had any jewelry missing. Anzualda said he had lost his bracelet. Delgado told Salazar
to wipe off the knife Salazar had used, a green camouflage pull-out blade, and throw
it out. Salazar opened the back seat door and threw the knife on the side of the road. 
Delgado asked if anybody had any cuts or scratches. Salazar reported he had cut his
finger when the knife accidently closed while he was stabbing Vasquez. Martinez
could see that Salazar had a cut on his finger, Martinez told the jury. Delgado also
wiped off his knife, which was the butcher knife with the taped handle the authorities
later recovered, and hurled it out the front passenger window. 

 The usual practice of the cadre, Martinez told the jury, was to get rid of clothes
used in the commission of a crime. The "ranking member" would either give orders
to burn them or get rid of them so there would be no evidence. Martinez testified that
after he got home that day, he took a shower. He stuffed his shoes and clothes in a
bag. He washed and vacuumed his mother's car and threw away all the beer bottles. 
Then he went fishing. On the way, he tossed the bag containing the clothes he had
worn that morning in a dumpster. 

 On March 31, Martinez testified, Salazar was wearing a brown shirt with a "low
rider" decal on it and a muscle shirt. Martinez identified items of partially burned
clothing retrieved by Goodwine as worn by Salazar on the day of the murder. He
identified other partially burned items of clothing as having been worn by the other
participants in Vasquez's murder. 

 Salazar initially asserted his right not to testify. Both sides rested and closed. 
Salazar changed his mind about testifying. The trial court permitted the defense to re-open. An alibi witness, Salazar's cousin Ramiro Anzualda, reluctantly testified. He
placed Salazar in Victoria between 8:00 and 11:00 the morning of March 31, 2000. 
Then Salazar testified in his own behalf. 

C. Salazar's Testimony


 Salazar denied participating in Vasquez's murder. He admitted being associated
with the cadre of felons but denied being a full-fledged member. He told the jury he
knew Delgado from "the streets, we just- he'd come stay at my house sometimes,
we'd drink beer and party and just stay at my house." Martinez and Salazar grew up
in the same neighborhood, Salazar testified. Amador Anzualda is also Salazar's cousin. 
Vasquez he met in prison. 

 While in jail awaiting trial for Vasquez's murder, Salazar testified, he received
a letter from Delgado. The trial court sustained the State's hearsay objection to
Delgado's letter. Over Salazar's objection during the prosecutor's cross-examination
of Salazar, the trial court admitted a letter written to Delgado's lawyer by Amador
Anzualda, also charged with Vasquez's murder. Anzualda wrote: (4) 

 Mr. Castas, 9-16-00


 Let me make this clear and state that on the '31' day of March
2/00 Mr. Jimmy D. Delgado was not at or in the scene of the crime. I
Amador Anzualda Jr. am a witness and I was a participant in this
incident, but had order's from 'Mike D." full name Michael Delgado
Martinez a member of an organization. ([the cadre]) Mike D. and Mateo (5)
came and picked me up about 8:45/9:00. Well, we then left to 'P.L.' (6)
in which he told me and Mateo that an individual known as (Chris
Vasquez) had owed him some money and he wanted us to beat him
down a little. We picked up 'Chris' about 9:50/10:15 while waiting for
Chris he told us that if we understood we replied yes. Well, Chris came
out and got in the car willingly. So, we stop at a store in which 'Chris'
purchased a '12' pack of budweiser or bud light. 


 I write a note to Mike D. telling him that to go somewheres where on one
could be a witness. I lid-up a 'sweet' with weed so we smoked but Chris
did not. I still had a drunkin feeling from the night before and Mateo was
still drunk from not sleeping all night. We got to the beach in which I
was not familiar with, but I do remember a statue. We all then get off
and grab a beer and start having small talk playing it off. I then go
behind a bush to throw a piss and Mike D. come's to tell me that if we
were ready. I said yes. So, we back laughing I then hit 'Chris' and
Mateo gets in. While we are fighting I hit Chris in the head with a bottle. 
He's on the ground while Mateo still hitting him. Mike D pull's out 2
knives I then told him 'no' that it was not to go down like that. Mike D.
get mad and starts telling me that I am supposed to follow's my order's.
If I don't that I will pay when we get back to Victoria. That he will run
court on us, because we were prospect's and we disobeyed his order's. 


 That this time I grab them and Mateo an I started to stab Chris. We first
stabbed Chris a couple of time's then stop, so Chris jumps into the beach
and Mateo go's after him. The two of them are struggling and Mateo is
drunk so he is getting tired. So, I then go to them both I grab Chris and
Mateo stab's him, but I get mad so I start stabbing Chris. While this I
and Mateo get tired, so we head back to shore. We are exhausted and
Mike D. got mad because Chris is still standing in the water. Mike D.
keep's telling us to go finish it, but we don't, so he go's himself and take
one of the knive's.


 While this he tell's us that when we get back Mateo and I were going to
pay. Well, he go's and grab's Chris by the neck and stabbs Chris in the
back. Then held's Chris underwater and cuts his throat. As Mike D.
walk back on land he stress-out that that's how to kill a m/f. He then
started telling us that we are going to pay. 


 Well, we get in the car and leave on the way back to Victoria. While on
the road we don't talk, but Mateo clean's the knives and whipes off for
finger prints to throw them out the door. 


 We get to Mike D. trailor and we leave Mateo and I. Mateo and I get to
the house and I call Jimmy to explain what went down. Jimmy came
over and told us not to worry that we won't get court run on us. But
Mike D [expletive]-up making us do that [expletive]. 


 So, you see, 'Jimmy D. Delgado' does not have part of the incident. 
Mike D. Martinez ordered this hit, because Chris owed him money. 
That's why Mateo and I did what we did, because our life's were on the
line at the time. Mike D. as I said is a member of the organization [the
cadre] and Mateo and I were prospects in this organization. Once more
we followed our order's for our live's and it was a order from Michael
Delgado Martinez.


 Signed,

 Amador Anzualda Jr. 

 During the State's case-in-chief, the jury learned from Delgado's attorney that
on September 19, 2000, Salazar, too, wrote a letter to him. Salazar wrote: (7) 

 O.K. Me and Jimmy stayed up all night drinking and snorting coke. Then
I sneaked in Maria's bedroom and stole the keys to the car. Me and J
took of cruzing about 7:00 we went to Fermin's house and talked for a
little while. When we left, I took the newspaper and we got in to the
car and left. We went cruzing for a little while. We went to Alex's
house and thats where we found M.D. We "Me, J, MICHAEL D.
MARTINEZ" went riding [in Mike D's car]. (8) About 8:00 AM or 8:30 we
went to P.L. and talked to a couple of people. I don't remember who but
we stopped a couple of places. We came back to Victoria and dropped
off Jimmy and we "MICHAEL D MARTINEZ, ME, FEO (9) went back to
P.L.! (10) The rest of the story has nothing to do with Jimmy. So I'll leave
it at that till we go to court. Oh Jimmy came over to my house and we
told him what happened. And thats it. 


 Mr. Costas. Saludos y Respeto.


 Watcha ase. (11) You don't know me and I don't know you. So don't be
assuming nothing about me. I'll go and testify that Jimmy is innosent. 
ITS all for one and one for all. (12) Abate y paz!! (13)

 /s/ Matthew Salazar

 Jimmy Delgado

 Matthew Salazar

 Amador Anzualda

 

 At trial, Salazar testified that what he wrote to Delgado's attorney was not true. 
He told the jury he wrote the letter to help Delgado, who had a wife and two children. 
"He's helped me out a lot this whole time I've been out," Salazar explained, "and I
wanted to give him back, you know, help him out on his case." 

 Salazar told the jury the truth was that his cousins Amador Anzualda and Ramiro
Anzualda, Delgado, and he were together at a nightclub in Victoria the night of
March 30, the night before Vasquez's murder. After the club closed, Salazar testified,
Delgado, Amador Anzualda, and Martinez went to Salazar's house. Ramiro Anzualda
came by later. They "were drinking, smoking pot and doing coke," Salazar told the
jury. Ramiro Anzualda left. Amador Anzualda fell asleep. At daybreak, Salazar told
the jury, Delgado and he cruised around town in a brown Delta 88 for an about an
hour. They went to "Fermin's" house, whom Delgado spoke with, and then to
Martinez's house. They bought two "sweets" (14) from Martinez. About 8:00 the
morning of March 31, 2000, Salazar left Delgado at Delgado's mother's house and
went home. He woke Amador Anzualda. They smoked the "sweet." Amador
Anzualda went back to sleep. Martinez showed up and wanted to go cruising. They
left in Martinez's Cadillac, Salazar told the jury. His blood, however, must have gotten
in the Cadillac a few days before, Salazar testified, when he rode in Martinez's car
after a bar fight. 

 Martinez dropped him off at Ramiro Anzualda's house, Salazar testified. He
stayed there until about 11:00 a.m. Then he walked to a girlfriend's house. He denied
being with Martinez and Delgado that morning when they went looking for Vasquez. 
He denied riding with them in Martinez's car to Port Lavaca. He denied being at the
LaSalle Monument on March 31 when Vasquez was murdered. 

 On May 7, 2001, the jury learned, Salazar wrote a letter to his cousin Amador
Anzualda while both were in jail awaiting trial. Salazar wrote: 

 Orale primo (15) it was good to receive your most welcomed letter. . . . 
Check this out primo you're always talking about "I don't ever want to
hear about this tema ever again. Well to bad if i got something to tell
you im going tell you and if you don't like it pues that's on you. Ora
check this out!! That letter you wrote to Costas is really [expletive] up. 
If it fell in to the wrong hands of someone who didn't know what was up
then you could be in a lot of trouble. S.C.D.! And i had it pero all my
property stayed in P.L. I pulled it out through my discovery. I wonder
how it got there?!? That's what i tried to tell you. Remember when you
asked me if i wrote to J's lawyer and i said yes, pero i didn't put nothing
on the letter. And you said that you did and . . . well you know the rest!! 
C.T.R. Every letter its like that. What kind of escuela is that. Nobre
pero a its cool cause im getting my wisedom and knowledge everyday. 
Your letters and everybody elses only make me a stronger person.


 Ora del Gavilan, watcha primo all my directas soap ETC ETC stayed in
P.L.. Todo. I'm having to borrow this [expletive] to stay en contacto con
todos. I didn't have anybodies directas no pen, paper. ETC ETC . . . im
was writing to el Capone you need to get on the ball and stop making
false accusations toward me. I also know that el Gato no longer holds
it down so im going to Chano. You always think a Meskins one step
behind you when in fact im right next to you!! I got nothing but love for
you primo pero im not going be taking to much more of you ATTITUDE. 
Oh yes and you do have one. This i know for a fact. No other homie has
ever come to me like that and believe me i have had a couple of
[illegible]. Pero nothing like one of your most precious letter.


 Ora i don't have anybodies directa so there is no way for me to send this
paperwork out. 


 Well primo i guess I'll let you go. Abate y paz!!

 Salazar explained to the jury that when he told Anzualda that if Anzualda's letter
fell into the wrong hands he would be in trouble, he meant it would make Anzualda
look bad. The reason it would make Anzualda look bad, Salazar continued, was
Anzualda had implicated the cadre. If a member of the cadre "was to get ahold of this
letter then he would be in a lot of trouble for putting the family in there." "The
family," the jury learned from Salazar, meant the cadre of felons. 

 Salazar admitted to the jury that he learned he was wanted in connection with
Vasquez's murder. To avoid apprehension, he testified, he fled to Houston, Corpus
Christi, and Robstown. When detained during a drug raid in Robstown a month after
Vasquez's murder, he gave a false name. The law enforcement officer who arrested
Salazar corroborated that portion of his testimony. 

III. DISCUSSION

A. Admission of Evidence


 In his second issue, Salazar asserts the trial court abused its discretion in
admitting Amador Anzualda's letter of September 16, 2000. He argues that
Anzualda's admission against interest was neither corroborated nor reliable. The State
responds that the trial court correctly admitted the letter as an admission against
Anzualda's interest. See Tex. R. Evid. 803(24). 

1. Standard of Review


 We review a trial court's admission or exclusion of evidence under an abuse-of-discretion standard. Montgomery v. State, 810 S.W.2d 372, 379-80 (Tex. Crim.
App. 1990). The abuse-of-discretion standard applies to our review of a trial court's
admission or exclusion of a hearsay admission against interest under rule 803(24). 
Tex. R. Evid. 803(24); see Cunningham v. State, 877 S.W.2d 310, 313 (Tex. Crim.
App. 1994) (excluding statement). An abuse of discretion occurs when the trial court
acts arbitrarily or unreasonably, without reference to guiding rules or principles. 
Montgomery, 810 S.W.2d at 380. In other words, an abuse of discretion occurs only
when the trial court's decision is so wrong as to lie outside that zone within which
reasonable persons might disagree. Id. A trial court has a "limited right to be wrong."
Our inquiry on appeal is whether the result was reached in an arbitrary or capricious
manner. Id. 

2. Rule of Evidence 803(24)


 A statement is not excluded by the hearsay rule if, at the time it was made, the
statement so far tended to subject the declarant to criminal liability that a reasonable
person in the declarant's position would not have the made the statement unless the
person believed it to be true. Tex. R. Evid. 803(24). Even then, an admission against
interest is not admissible unless corroborating circumstances supply clear indicia of the
trustworthiness of the statement. See id. Thus, any determination of the admissibility
of an admission against interest pursuant to rule 803(24) requires a two-step inquiry.
Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1994). First, the trial court
must determine if the statement tends to expose the declarant to criminal liability. Id. 
Second, the trial court must determine if corroborating circumstances clearly indicate
the trustworthiness of the statement. Id. If both these criteria are met, rule 803(24)
is satisfied. Id. The statement is admissible. Id. 

 The focus of our inquiry is on verifying, to the greatest extent possible, the
trustworthiness of the admission against interest. Id. at 58. Our goal, and that of the
trial court, is to avoid the admissibility of a fabrication. Id. Factors include: 
(1) whether the guilt of the declarant is inconsistent with the guilt of the accused;
(2) whether the declarant had the opportunity to commit the crime; (3) the timing of
the declaration and its spontaneity; (4) the relationship between the declarant and the
party to whom the declaration was made; and (5) the existence of independent,
corroborative facts. Id. 

 We consider evidence that undermines the reliability of the admission as well
as evidence corroborating its trustworthiness. Id. We are careful not to weigh the
credibility of the declarant. Id. 

3. Evidentiary Analysis


 Amador Anzualda's letter exposed him to criminal liability for his role in
Vasquez's murder. We find that the State met the first prong to establish admissibility
of the letter under rule 803(24). See id. Further, the jury heard corroborating
testimony that Martinez and several other men were in Port Lavaca the morning of
March 31, 2000. They were seen in Port Lavaca in a bronze-colored Cadillac, asking
where Vasquez lived. Non-accomplice testimony corroborated that Martinez drove a
bronze-colored Cadillac and that the men had found out where Vasquez lived. Other
non-accomplice testimony corroborated that Vasquez left with at least two other men
in a dark Cadillac around 10:00 or 10:15 the morning of March 31. Meanwhile, about
10:00 or 10:30 that same morning, another non-accomplice witness noticed a dark-colored Cadillac on the way to Magnolia Beach. The car was not at the LaSalle
Monument a few minutes later. Shortly thereafter, however, other non-accomplice
witnesses in the vicinity of the LaSalle Monument saw three Hispanic men standing
near a bronze-colored Cadillac. By 11:49 a.m., Vasquez's girlfriend had reported him
missing. By 1:13 p.m. the same day, Vasquez lay dead on the beach near the LaSalle
Monument. 

 Forensic tests connected Salazar to blood found in a bronze-colored Cadillac in
Martinez's possession six days after the murder. The medical examiner's descriptions
of Vasquez's injuries and manner of death corresponded to Anzualda's description of
the murder. The scene of the crime, near the LaSalle Monument, corresponded with
Anzualda's description of the location. Finally, Salazar's own testimony placed him
in Martinez's company in Martinez's Cadillac the morning Vasquez was murdered. Salazar argues that the letter is inherently unreliable in that it does not reflect
the truth because Anzualda wrote it to exonerate Delgado. Applying the factors
suggested by Bingham to the circumstances surrounding Anzualda's admission,
particularly with regard to the corroborated details, we find that the trial court did not
abuse its discretion in determining that the letter possessed adequate indicia of
trustworthiness. See id. at 58. We find that Anzualda's motivation for writing the
letter to Delgado's lawyer raises an issue of his credibility, not an issue of the
admissibility of his statement against interest. See id. Accordingly, we hold that the
trial court did not abuse its discretion in admitting under rule 803(24) Anzualda's letter
to Delgado's attorney. See id. We find no evidentiary error. We overrule Salazar's
second issue. 

B. Denial of Salazar's Motion for Directed Verdict
 

 In his first issue, Salazar asserts that the trial court erroneously denied his
motion for directed verdict at the close of the State's case-in-chief. Excluding
Martinez's testimony, Salazar contends, the State did not produce any witness who
saw Salazar with Vasquez on the day of the murder. Salazar argues, therefore, that
Martinez's testimony was not corroborated. 

 The State replies that other non-accomplice testimony sufficiently corroborated
Martinez's testimony to implicate Salazar in the crime. The State emphasizes that
Salazar's blood was found in the car used in the murder. 

1. Standard of Review


 A challenge on appeal to the denial of a motion for directed verdict is a
challenge to the legal sufficiency of the evidence. Williams v. State,
937 S.W.2d 479, 482 (Tex. Crim. App. 1996). A legal-sufficiency challenge calls on
us to review the relevant evidence in the light most favorable to the verdict. Jackson
v. Virginia, 443 U.S. 307, 319 (1979); Swearingen v. State, 101 S.W.3d 89, 95 (Tex.
Crim. App. 2003); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). We
consider all the evidence that sustains the conviction, whether properly or improperly
admitted. Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) (citing Garcia
v. State, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994)). Similarly, we consider all
the evidence that sustains the conviction, whether submitted by the prosecution or the
defense, in determining the legal sufficiency of the evidence. Cook v. State,
858 S.W.2d 467, 470 (Tex. Crim. App. 1993). The legal sufficiency of the evidence
is measured against the elements of the offense as defined by a hypothetically correct
jury charge for the case. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim.
App. 1997). This standard of legal sufficiency ensures that a judgment of acquittal
is reserved for those situations in which there is an actual failure in the State's proof
of the crime rather than a mere error in the jury charge submitted. Id. We then
determine if any rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt. Jackson, 443 U.S. at 319; Johnson, 23 S.W.3d
at 7. 

 If we reverse a criminal case for legal insufficiency, we reform the judgment of
conviction to reflect conviction for a lesser offense only if a jury charge on the lesser
offense was either submitted or requested but denied. Collier v. State,
999 S.W.2d 779, 782 (Tex. Crim. App. 1999). Otherwise, we vacate the judgment
of conviction for legal insufficiency and order a judgment of acquittal. Swearingen,
101 S.W.3d at 95. 

2. The Hypothetically Correct Charge

 A hypothetically correct charge is one that accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State's burden of
proof or restrict its theories of liability, and adequately describes the particular offense
for which the defendant was tried. Malik, 953 S.W.2d at 240. A person commits the
offense of murder by intentionally or knowingly causing the death of another. See
Tex. Code Crim. Proc. Ann. §19.02(b)(1) (Vernon 2003). With sufficient evidence of
Salazar's participation in the planning and commission of Vasquez's murder, the
indictment supported a jury instruction on the law of parties without a parties
allegation in the indictment. (16) See Goff v. State, 931 S.W.2d 537, 544 n.5 (Tex.
Crim. App. 1996). In determining whether an accused participated as a party in an
offense, a fact finder may examine the events occurring before, during, and after the
commission of the offense and rely on actions of the accused that show an
understanding and common design to commit the offense. Hanson v. State,
55 S.W.3d 681, 690 (Tex. App.-Austin 2001, pet. ref'd). Thus, conviction was
authorized under the evidence in this case if a rational jury could find that Salazar
intentionally caused Vasquez's death, either as a principal or as a party. See Tex.
Code Crim. Proc. Ann. §19.02(b)(1) (Vernon 2003); see also Hanson, 55 S.W.3d
at 690. 

3. Corroboration of Accomplice Testimony


 An accomplice is a person who participates in an offense before, during, or after
its commission to the extent that the person can be charged with the offense or with
a lesser offense. Herron v. State, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002) (citing
Blake v. State, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998)). A prosecution
witness indicted for the same offense as the accused is an accomplice as a matter of
law. Id. (citing Ex parte Zepeda, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991)). 

 As an accomplice, Martinez's testimony must be "corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the offense." Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 1979). We look for corroboration to all
non-accomplice evidence, both prosecution and defense. Cook, 858 S.W.2d at 470. 
The required corroborative evidence may be either circumstantial or direct and need not
directly link the accused to the crime. Richardson v. State, 879 S.W.2d 874, 880
(Tex. Crim. App. 1993); Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim.
App. 1988). Further, the corroborating evidence need not establish guilt beyond a
reasonable doubt. Id. 

 Finally, "proof that the accused was at or near the scene of the crime at or
about the time of its commission, when coupled with other suspicious circumstances,
may tend to connect the accused to the crime so as to furnish sufficient corroboration
to support a conviction." Brown v. State, 672 S.W.2d 487, 489 (Tex. Crim.
App. 1984). Apparently insignificant incriminating circumstances may afford
satisfactory corroboration. Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim.
App. 1993). Evidence that an accused was in the company of the accomplice at or
near the time or place of a crime is proper corroborating evidence to support a
conviction. Hernandez v. State, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997). 

4. Inferences of Guilt


 Evidence of flight is admissible as a circumstance from which a jury may draw
an inference of guilt. Bigby v. State, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994). 
Similarly, a jury may conclude that an accused's use of a false name immediately after
the commission of an offense tends to connect the accused to that offense. Cockrum
v. State, 758 S.W.2d 577, 582 (Tex. Crim. App. 1988). 

5. Legal-Sufficiency Analysis


 As is almost always the case, Salazar's intent must be established by
circumstantial evidence. See Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App.
[Panel Op.]1978). The jury may infer the requisite intent from Salazar's conduct. See
Conner, 67 S.W.3d at 197. 

 Salazar's own testimony placed him in Martinez's company in Martinez's
Cadillac the morning Vasquez was murdered. We must consider this evidence in
determining the legal sufficiency of the evidence, even though Salazar moved for
directed verdict at the close the State's case-in-chief. See Cook, 858 S.W.2d at 470. 
The rest of the non-accomplice testimony and forensic evidence that corroborated
Amador Anzualda's admission against interest also corroborated Martinez's testimony. 
In addition, Martinez's testimony included the detail that Salazar had been cut during
the struggle with Vasquez and had ridden in the Cadillac afterwards. Forensic tests
identified Salazar's blood in the Cadillac where Martinez said Salazar sat after the
murder. Other forensic evidence connected Vasquez to blood on a gold nugget
bracelet found at the scene. Martinez's testimony tied the bracelet to Amador
Anzualda, placed him at the crime scene, and confirmed that he had lost the bracelet
during the struggle with Vasquez. The authorities recovered a weapon that matched
a description Martinez gave them, where Martinez said they would find it. Finally,
Martinez's testimony described the cadre's practice of destroying evidence and
connected Salazar and other participants in the murder to partially burned clothing
found in the vicinity. Accordingly, we find that Martinez's testimony implicating
Salazar as a principal in Vasquez's murder is amply corroborated. See Hernandez, 
939 S.W.2d at 178; see also Munoz, 853 S.W.2d at 559; Brown, 672 S.W.2d
at 489. 

 Moreover, the jury learned that Delgado, Amador Anzualda, and Salazar
corresponded with one another from jail as they awaited trial for Vasquez's murder. 
The jury read Salazar's letter chastising Anzualda for implicating the cadre of felons
to which all four men implicated in Vasquez's murder belonged. Salazar's own words
confirmed that members of the cadre were "all for one and one for all." We find that
the jury could have inferred that Salazar's actions before, during, and after Vasquez's
murder showed an understanding of the offense as a party. See Hanson, 55 S.W.3d
at 690. 

 Finally, the jury heard that Salazar fled to escape apprehension for Vasquez's
murder. He admitted to the jury he gave a false name when he was detained for
another offense a month later. See Bigby, 892 S.W.2d at 883; see also Cockrum,
758 S.W.2d at 582. We find that the jury could have inferred Salazar's consciousness
of guilt from his efforts to avoid detection after Vasquez's murder. See Bigby,
892 S.W.2d at 883; see also Cockrum, 758 S.W.2d at 582. 

 Considering only the evidence in favor of the verdict, both prosecution and
defense, and applying the evidence to a hypothetically correct jury charge on murder
and the law of parties, we find that any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. See Jackson, 443 U.S.
at 319; see also Johnson, 23 S.W.3d at 7. Accordingly, we hold that the trial court
did not err in overruling Salazar's motion for directed verdict. We overrule his first
issue. 

IV. CONCLUSION

 We have overruled both of Salazar's issues. We affirm the trial court's
judgment. 


 ERRLINDA CASTILLO

 Justice




Do not publish. 

Tex. R. App. P. 47.2(b).


Opinion delivered and filed

this 28th day of August, 2003. 

1. See Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). 
2. We find the organization discussed in published and unpublished cases in Texas dating
from 1990. See, e.g., Esparza v. Diaz, 802 S.W.2d 772, 778 (Tex. App.-Houston [14th Dist.] 1990,
no writ).
3. "Cadre" is defined as "[a] nucleus or core group especially of trained personnel or active
members of an organization who are capable of assuming leadership or of training and indoctrinating
others." Webster's Third New Int'l Dictionary 312 (1993). 
4. Errors in the original handwritten text are reproduced here.
5. Mateo is Salazar's first name in Spanish. 
6. The jury heard this meant Port Lavaca. 
7. Errors in the original handwritten text are reproduced here.
8. The phrase was written in the margin with an arrow pointing to "riding."
9. Salazar testified "Feo" was Anzualda's street name. 
10. The jury heard this meant Port Lavaca.
11. Salazar's translation was "Check this out, Dude."
12. Salazar's translation was "like a loyal thing between us." 
13. Salazar's translation was "Neighbors in peace."
14. Salazar explained, "It's a Swisher Sweet cigar cut open with marijuana stuffed inside." 
15. Salazar translated that "primo" means cousin. 
16. Salazar does not assert charge error.