**Opinion issued March 21, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00094-CR**

———————————

**LARRY DALE KING, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th Judicial District Court**
**Brazoria County, Texas**
**Trial Court Case No. 91525-CR**

---

**MEMORANDUM OPINION**

A jury convicted appellant Larry Dale King, Jr. of tampering with physical evidence—a human corpse—and sentenced him to twenty years' confinement with a $9,800 fine. *See* TEX. PENAL CODE §§ 37.09(c), (d)(1). Though not entirely clear from Larry's briefing, we construe his arguments as challenging (1) the sufficiency

of the evidence corroborating an accomplice witness's testimony; and (2) the legal sufficiency of the evidence supporting his conviction.[1] For the reasons discussed below, we affirm.

## Background

Larry was charged with tampering with physical evidence—specifically, the remains of his girlfriend, Staysha Lea. He proceeded to a jury trial.

### A.    Matt's Testimony

Larry's accomplice, his brother, Matt, testified for the State.[2] He testified that in late July 2020, he allowed Larry and Lea to move in with him while Larry looked for a job. Matt did not want any drugs in his apartment, because he was working to regain custody of his children. Shortly before the August rent was due, Matt noticed

---

[1]    Larry only raises one enumerated issue in his appellate briefing, stating: "The evidence adduced at trial was insufficient to support this conviction under the Texas Code of Criminal Procedure, article 38.14, a conviction cannot stand on the accomplice witness's testimony unless the testimony is corroborated by other, non[-]accomplice evidence that tends to connect the accused to the offense." Elsewhere in his brief, Larry explicitly states that he "challenges the legal sufficiency of the evidence to support his conviction[]" and discusses the *Jackson v. Virginia* legal sufficiency standard. *See* 443 U.S. 307 (1979). Construing Larry's briefing liberally, as we must, we address both arguments. *See* TEX. R. APP. P. 38.1, 38.9.

[2]    At the time of trial, Matt had been in jail for twenty-nine months. Matt testified that in exchange for his testimony, he was given use immunity relating to felony charges against him for tampering with physical evidence. Use immunity is "immunity from the use of the compelled testimony and any evidence derived therefrom"; by contrast, transactional immunity is "immunity from prosecution for offenses to which [the] compelled testimony relates." *Foyt v. State*, 602 S.W.3d 23, 41 n.6 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd).

that $400 was missing from his wallet. He suspected Lea took the money. After Larry paid the entire month's rent, Matt "let it go."

On Sunday, August 9, 2020, Matt was getting ready for a visit with his children when he realized his phone was missing. Lea had left the apartment earlier, claiming she was going to sell some jewelry for money. Matt and Larry searched the apartment but did not find the phone. Instead, they found a baggie containing white residue in Lea's bedroom. Matt left for the visit without his phone, upset that it appeared Lea had drugs in his apartment.

Lea had taken a car that belonged to Matt's friend when she left earlier that day. Larry did not hear from Lea until late in the evening, when she told him that she had left the vehicle at a nearby Buc-ee's. Matt, Larry, and some friends drove to Buc-ee's to pick up the car, which had run out of gas. Lea was not at the gas station. Later, Lea told Matt that she had left his phone in the glove compartment of the vehicle. When Matt retrieved his phone, he discovered that Lea had used the CashApp application to obtain $200 from Matt's father, purporting to be Matt.

Matt testified that on the morning of August 10, 2020, between 1:00 a.m. and 2:00 a.m., he received a call from a police officer at the gas station. The officer testified at trial that Lea had been sitting outside in front of the store, and Lea asked her to call Larry, because Lea's phone had died. The officer called Larry, who said he would come pick up Lea. Matt then got on the phone with the officer, "yelling

3

about the fact that [Lea] possibly took $200 from him." Matt then arrived at Buc-ee's without Larry. According to Matt, he went to Buc-ee's to get Lea's key to the apartment, but she would not return it. Matt told the officer that Lea was not allowed to return to the apartment. However, the officer advised Lea that Matt could not keep her out of the apartment "because that's where she had established residency." Lea stayed at the gas station, and Matt returned home.

Matt testified that later that morning, he went to work. As he left the apartment, he told Larry to sleep on the sofa with the sofa blocking the door to keep Lea out. Matt stopped at Buc-ee's on his way to work and saw Lea. On his way out, he told her not to come back to the apartment. Larry called Matt later and said Lea had been trying to get in. Subsequently, Lea gained entry to the apartment. Matt returned home to serve Lea with a homemade eviction notice, stating, "Happy birthday. You're getting evicted."[3] He then locked Lea outside on the apartment's second-floor balcony while she was smoking. Matt testified that he also changed the locks, took Lea's door off its hinges, and removed the thermostat. Matt stated that he believed Lea was under the influence of drugs and wanted her to be uncomfortable. He testified that the temperature was in the mid to high nineties that afternoon.

---

[3] August 10th was Lea's birthday.

Lea called police to report that she had been locked out of the apartment. After an officer arrived, she was able to use her key to unlock the balcony door. Lea also called the apartment manager to report Matt's removal of the door and thermostat, and the manager called Matt. Matt got the impression that all the occupants would be evicted if the situation was not resolved.

Matt spent the next few hours at a friend's apartment down the hall. He testified that police were dispatched to the apartment two more times following calls from Lea. Lea called to report that Matt had closed the windows to the apartment after Lea had opened them. Matt testified that he did this more than once because he did not want bugs to get into the apartment. The last time police came to the apartment, around midnight or 1:00 a.m., they advised that the situation was a civil matter, not criminal, and asked Lea to stop calling. According to Matt, during this time, Larry was "always walking off . . . playing his little game on his phone."

Matt attempted to stay at his neighbor's apartment that night, but he eventually returned home between 12:30 a.m. and 1:00 a.m. When he entered the apartment, the light to Larry and Lea's bedroom was on, but the lights in the other rooms were off. Matt testified that he observed Larry "sitting on top of [Lea] . . . straddling her abdomen." Matt stated that Larry was "sitting on her stomach with her arms pinned between his legs and her body." Lea was not moving. He testified that when he was finally able to see Lea four to five minutes later, she "was blueish gray in the face"

and was dead. Matt did not say anything, but Larry saw him. Larry approached Matt, who was backed up against a wall, and "told [Matt he] was going to help him or else."

According to Matt, Larry told him that Lea sent Larry a text message stating that she was "doubling down."[4] Larry took this as a threat and went upstairs to take her phone from her. The two got into a "scuffling match" and Larry "ended up on top of her." Larry did not tell Matt what exactly happened next, but Larry said he did not want to go back to jail.

Matt then testified regarding the pair's efforts to move Lea and hide her body. Larry spread a blanket out in the bedroom and obtained a roll of duct tape. Next, the two men rolled Lea into the blanket, taped it up, and dragged her into the living room, where they waited until the coast was clear to move her to the trunk of Larry's car. Matt estimated that they waited an hour or an hour and a half. He could not recall what they discussed while waiting. He recalled seeing Lea's smashed cell phone in the apartment, though he did not see Larry break it. They then dipped Lea's cell phone in water "to kill it," placed it in a baggy, and left it on the countertop. Matt testified that it was Larry who decided they should take Lea's body somewhere

---

[4]  Larry provided a written statement to investigators on August 27, 2020, which was admitted at trial. In the statement, Larry recounted that he received a message from Lea to this effect at approximately 10:45 p.m.

to dispose of it. Larry was on his cell phone "looking up places that [they] could take her to." When Larry decided on a location, they left the apartment.

When they arrived at the car, Larry removed the light from the trunk[5] of the car, and the men placed her inside. With Larry at the wheel, they first drove to their parents' home in Van Vleck to establish an alibi. The drive took fifteen to twenty minutes. Matt testified that they remained at their parents' home for approximately thirty minutes. Larry picked up a bottle of bleach, "stuffed it in his clothing," and walked outside with it. Larry Sr. followed Larry outside, and Matt stayed inside with their mother.

When they left, Matt and Larry traveled east along Highway 35 toward County Road 477. Ultimately, they drove the car down a pipeline right-of-way and found a spot to dump the body. The men dragged Lea's body from the trunk, unwrapped her, and wiped the body with the bleach and a t-shirt from the trunk. Matt testified that they wiped the body to remove any fingerprints. They then got back in the car to return to the apartment. On their way home, they threw out the t-shirt and bleach bottle at different gas stations. Larry told Matt that he disposed of the blanket a week or so later. Matt estimated that they arrived back at the apartment at 6:30 a.m. They then went to sleep before heading to work at approximately 9:00 a.m.

---

[5]     Photographs admitted at trial demonstrated the removal of the trunk light in Larry's car.

At some point after the disposal of Lea's body, Matt and Larry agreed to a version of events they would tell anyone who asked about Lea's disappearance. Matt testified that the story was "[t]hat [Lea] left the apartment on her own free will and just dropped off the face of the earth." However, the men "didn't go over the story enough times for it to actually stay with [Matt]," and he "fumbled it up."

On September 5, 2020, a police officer interviewed Matt at work about Lea's disappearance. Matt initially told the officer that Lea was at the apartment when he came back from his parents' home on August 11, 2020, but then she left.[6] Matt returned to his apartment that day after he got off work. Larry arrived some time thereafter. Matt testified that Larry "had a sick look on his face and he turned around and walked out." Matt found out later that Larry went to their parents' home. He tried reaching Larry several times, but only got Larry's voicemail. On September 7, 2020, Matt called police to let them know that Larry "was on the run."

A few days later, Matt spoke with his boss, Murray Underwood. Matt told Underwood that he knew where Lea was and just wanted to say goodbye to his children before turning himself in. Matt went to his children's mother's home in Texas City, and police met him there. Matt got into the police car, told the officers

---

[6] That same day, Larry told officers a different version of events—that Lea was gone by the time they returned on August 11, 2020.

what happened, and took them to the site of Lea's remains. The following day, he provided a written statement detailing his account of the events.

## B. Other Testimony

The jury also heard testimony from several other individuals, including Matt and Larry's friend and coworker, Eric Tilitzki; their boss, Murray Underwood; and their brother, Dwayne King. Officers involved in the investigation also testified.

Regarding the incident at issue, Eric recalled that Matt and Larry arrived to work late on August 11, 2020. He testified that Matt seemed more tired than normal, was extremely late, and standoffish. Eric knew that Matt and Larry were attempting to have the landlord evict Lea on August 11, so he thought it was odd that they did not come discuss the matter with him when they arrived at work. Later that evening, Matt eventually approached Eric at work. Matt told Eric that he gave Lea $200 and "she just left." According to Eric, this "[j]ust didn't feel right," so he decided to question the men further. He asked the men to come by his house that evening. When they did, he kept asking questions. Eventually, Larry told Eric that "[Lea] had to go and they took care of it." When the men left, Eric "didn't feel good about that conversation at all" and wanted to press the issue further. He invited them back a few nights later, and Matt eventually stated that "[Lea] was deceased and her body was disposed of in another county." Neither of the men would disclose the location of Lea's body. On September 5, 2020, Eric provided a written statement to police.

The jury also heard testimony from Murray Underwood, the owner of Brazos Motorsports. Underwood testified that Matt and Larry began working for him in the summer of 2020. Matt and Larry were hired as mechanics and were good workers. When Matt began "messing up pretty bad" on some general repairs, Underwood felt "his head wasn't in the game" and decided to terminate him. He also testified that Matt was distant, very nervous, and was not acting like himself. Regarding Larry, he said that he changed his appearance by "cut[ing] his hair off" and then stopped coming to work. When he later came in to pick up his last paycheck, Underwood did not recognize him. After that, he never heard from Larry again.

Before firing Matt, Underwood decided to ask him about what was going on with him personally. Matt said he was nervous. Underwood testified that he "could just tell he had something on his mind he wanted to get off his chest." Matt told Underwood that "he was pressured" and that Larry "made him help him get rid of a body." Underwood testified that the body belonged to "the girlfriend of his brother." Underwood then told Matt he needed to turn himself in, and he also contacted the police department and provided a statement. The last Underwood heard from Matt was a text message stating he was turning himself in to police.

Dwayne King also testified at trial. Dwayne explained that he is younger than Larry but older than Matt. At the time of Lea's disappearance, Dwayne lived in Oklahoma. In September 2020, he came to Texas to drop off a truck for his father.

10

When Dwayne arrived, he spent the night at his parent's house in Van Vleck. On September 5, 2020, he received a text message from Larry, asking Dwayne to pick him up. Dwayne went to get Larry and the two went fishing. Later that night, they returned to their parents' home. The next day, Larry went to church with Dwayne and their parents. Dwayne testified that this was unusual for Larry because he is not religious. After lunch, Dwayne was getting ready to return to Oklahoma. Larry told Dwayne that he was going to Pennsylvania for work and was taking a bus. He claimed that his bus was passing through Oklahoma City, and asked Dwayne if he could ride with him to Oklahoma. Dwayne presumed Lea "wasn't in the picture" if Larry was going to work in Pennsylvania without Lea, because Larry typically "[took] her with him everywhere and he was by himself."

Dwayne described the ride to Oklahoma as awkward. He testified that Larry pretended to sleep most of the ride, and talking was minimal. The men arrived in Oklahoma late that evening. Larry spent the night with Dwayne, and the next day, Dwayne dropped Larry off at the bus stop on his way to work.

Dwayne recalled that Matt turned himself in the following Wednesday. That day, Matt called Dwayne to tell him he was about to turn himself in for helping Larry hide Lea's body.

Dwayne did not have contact with Larry for ten or eleven months. He testified that he eventually heard from Larry in summer 2021. Larry called Dwayne from an

unknown number and asked if he would come to the bus station to pick him up. When Larry got in the car, he asked Dwayne "how big it was." Dwayne explained that he understood Larry to be asking about Lea's case. Dwayne told him that it was "pretty big." Dwayne knew that police were looking for Larry, and he told Larry this. He told Larry that he could come to the house to eat and shower, but then he would have to leave. Larry told Dwayne that "somebody killed [Lea]" and that police were looking for him. Larry also told Dwayne that "he felt bad for Matt going through this." Larry brought gifts for Dwayne and his wife. Dwayne testified that Larry also had some "skull heads," which Dwayne thought was strange. Dwayne testified that Larry explained "it was like [Lea] was with him" and that the skulls brought him closer to Lea. Larry then left Dwayne's house after a few hours.

## C. Recorded Interviews

Though Larry did not testify at trial, the State showed the jury three recorded interviews he gave to police, all on September 5, 2020. In these interviews, Larry gave officers an account of his on-and-off again relationship with Lea, beginning in 2015. Larry knew Lea had a drug problem and had been through drug treatment before their relationship began. He learned that she began using drugs again in December 2018. After that, Larry attempted to get Lea into various treatment programs, but she was not interested. Larry also told officers that she repeatedly took

12

money from him and even when they were broken up, Lea would call him when she knew he was getting paid.

Regarding the days leading up to Lea's disappearance, Larry told officers how Matt believed Lea took $400 from his wallet. Larry told Matt Lea never took money in such an obvious manner—she preferred more surreptitious methods. Regardless, Larry covered the $400 they needed to make rent. Larry then took what little money he had left to buy groceries. Larry knew Lea's birthday was coming up, and he did not have money for a present, so he bought the ingredients for her favorite meal. Instead of being appreciative, Lea was upset that they did not have money for beer or cigarettes. Lea told Larry she had decided to sell one of her necklaces for money and then left to meet the buyer, approximately forty-five minutes away.

That same day, Matt's phone went missing. Larry and Matt searched the house but could not find the phone. Larry stated that Matt eventually had to leave for an appointment without his phone. While Matt and Lea were out of the apartment, Larry searched Lea's things for the missing phone. When Matt came home, he continued with the search. At that point, Matt and Larry found what they believed to be a used bag of drugs under Lea's dresser. Matt then told Larry that Lea needed to move out because Matt did not want any drugs in his apartment. Larry called Lea and told her what they had found, and that Matt wanted her out of the apartment. He then accused her of taking the phone and the $400. Larry also accused her of leaving to buy drugs

and not to sell jewelry. According to Larry, Lea only denied the accusation that the baggy contained drugs. She then began asking Larry for gas money, even though she had told him she would take her last ten dollars and fill up before she left. Larry told Lea that he would not come pick her up. Sometime after midnight, Lea called Larry and asked for a ride. Larry told Lea that he would not come get her, and that she needed to return Matt's car. Eventually, Lea called and stated that the car was at Buc-ee's. Matt, Larry, and some friends drove to Buc-ee's in two vehicles to pick up the car. There, they found the keys and Matt's phone inside the car, but did not see Lea.

Later that night, Lea had an officer call the house to ask the men to let her back in. According to Larry, Matt went to Buc-ee's to tell Lea she could not come back for the night. Larry slept on the couch with the couch blocking the door so that Lea could not return. Larry told officers that the next day, Monday, was Lea's birthday. Matt went to work that morning, but Larry was scheduled to be off. Shortly after Matt left for work, Lea arrived at the apartment. Larry told Lea that she could not come in, and she called police. Larry called Matt to let him know Lea had returned, and Matt came home from work. Subsequently, Matt, an officer, and Lea had a discussion outside while Larry remained inside. At some point, Matt and the officer left, and Lea got inside. Larry again called Matt and let him know.

14

Lea told Larry she needed time to get into a program, but he told her she could not stay at the apartment any longer. When Matt came home from work again, he removed the thermostat and changed the locks on the front door. Larry and Matt left to hang out with friends because the apartment was getting hot. Lea and Matt took turns opening and closing the windows. Following another call from Lea, officers returned to the apartment. At that time, Matt, Larry, and some friends were outside the apartment. The officers spoke with Matt, Larry, and their friends. Larry recalled that the last officer advised them that the situation was a civil matter, and that if they kept calling police, someone would be arrested. Larry claimed that they then went inside and began watching television, but it was very hot in the apartment—around ninety-five degrees. They then decided to go to their parent's house, sometime after midnight.

During the interview, Larry told the officers that his parents had been living in a camper in Van Vleck, Texas. When they arrived, both their mother and father were at home. Larry claimed they stayed up talking to their father for awhile and did not go to sleep. They returned to their apartment between 5:30 a.m. and 6:30 a.m. Larry denied that the pair made any stops on the way to their parents' home or on the way back. According to Larry, when they returned to the apartment, the door was unlocked. Larry reported that Lea was not in the apartment when they returned. He stated that they then locked the door and attempted to take a quick nap before

15

going to work. Larry indicated that he and Matt arrived at work late because they overslept, and when they arrived home after work that evening, Lea was still not there.

Toward the conclusion of the interview, the officer confronted Larry with Matt's earlier statement that Lea was at the apartment when the men returned from the visit to their parents' house. Larry repeatedly denied that this was true. Larry also told the officers that he sent a text message to Lea, letting her know that her mother was looking for her. The officers told Larry that Lea's phone had not been used since she called 9-1-1 on the night of August 11, 2020. Officers also told Larry that someone had reported that Larry said he "took care of the problem" with Lea and disposed of her body. Larry maintained throughout the interview that he did not do anything to harm Lea and did not know what had happened to her.

The jury was given an accomplice-witness instruction with regard to Matt, instructing that Larry could not be convicted upon Matt's testimony unless it found (1) Matt's testimony to be credible and that it showed Larry was "guilty beyond a reasonable doubt," and (2) other evidence in the case, outside of Matt's evidence, "tending to connect" Larry with the offense charged.[7] On January 30, 2023, the jury

---

[7]     Larry was not charged for Lea's murder—only with tampering with physical evidence. At trial, the jury heard testimony from the medical examiner, who explained that because only skeletal remains of Lea were recovered, she could not determine her cause of death.

found Larry guilty of tampering with physical evidence, sentenced him to twenty years' confinement in the Texas Department of Criminal Justice–Institutional Division, and imposed a $9,800 fine. The trial court signed a judgment of conviction on February 8, 2023, and this appeal followed.

## Accomplice Witness Testimony

We first consider Larry's argument that the evidence presented at trial was insufficient to corroborate Matt's accomplice-witness testimony.[8]

### A.    Standard of Review

An accomplice is a person who participates with a defendant in the charged offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14.

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there

---

[8]    The parties do not dispute that Matt was an accomplice for purposes of the accomplice-witness rule.

is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). We view corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). If there are two views of the evidence, one tending to connect the accused to the offense and the other not, we defer to the jury's view. *Smith*, 332 S.W.3d at 442. "[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.*

"[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone*, 253 S.W.3d at 257. Nor is it necessary "that the corroborating evidence directly connect the defendant to the crime." *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Instead, the corroborating evidence must only link the defendant in some way to the commission of the crime and show that "rational jurors could conclude that this evidence sufficiently tended to connect the accused to the offense." *Malone*, 253 S.W.3d at 257 (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997) (internal alterations omitted)). The corroborating evidence need only "connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016) ("The corroboration requirement in Article 38.14 does not apply separately to each element

18

of the offense charged or to each aspect of the accomplice's testimony."). There is no set amount of non-accomplice corroborating evidence that is required; instead, each case must be judged by its own facts. *Malone*, 253 S.W.3d at 257.

Although a defendant's mere presence at the scene of the crime, by itself, is not sufficient to corroborate accomplice testimony, such evidence "when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Id.* (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). The corroborating evidence may be direct or circumstantial. *See Smith*, 332 S.W.3d at 442. "If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of Article 38.14 has been fulfilled." *Cathey*, 992 S.W.2d at 462.

**B.    Analysis**

Larry contends that "[t]he non-accomplice evidence does not show that [he] had both the motive and opportunity to tamper with the physical evidence or was present at the time of the tampering." We disagree with Larry's characterization of the record evidence. Excluding the testimony of the accomplice (Matt), we are left with the following evidence:

In his recorded interviews, Larry placed himself with Matt at the time Matt claims the offense occurred. Larry admitted to officers he was with Matt the entire evening of August 11, 2020, when he contends that the men last saw Lea. This is

19

also the timeframe that Matt testified that the disposal of Lea's body took place, and the last time Lea used her cell phone, according to her phone records. Our courts have held that the presence of the accused with the accomplice witness at or near the scene of the crime or about the time of its commission, when coupled with other suspicious circumstances, may be sufficient to corroborate the testimony of the accomplice witness to support a conviction. *See, e.g.*, *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988) (corroborating evidence included appellant's statements to police acknowledging presence at time of offense, though no non-accomplice witnesses placed him with accomplice); *Custard v. State*, 812 S.W.2d 82, 85 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd)) (appellant's statements that he was with accomplice at time of shooting, though he contended accomplice was shooter, tended to connect him to murder).

Larry also gave false information to investigators. In his recorded interview, Larry reported that he sent a text message to Lea on August 12, 2020. However, the investigator assigned to Lea's case, Lieutenant Jacqueline Moore, testified that Lea's phone records revealed this was untrue. Lying to police officers is conduct showing a consciousness of guilt and may be considered as circumstantial evidence of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (making false statements to cover up crime is evidence indicating consciousness of guilt and attempt to cover up crime); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—

Austin 1990, no pet.) (defendant's conduct after crime indicating consciousness of guilt is "one of the strongest kinds of evidence of guilt").

Additionally, testimony of other witnesses at trial tended to connect Larry with the tampering. First, Eric Tilitzki testified that Larry told him that "[Lea] had to go and they took care of it." This statement by Larry is an admission of guilt made to a non-accomplice witness and tends to connect Larry to the offense. *See Joubert*, 235 S.W.3d at 731 (holding defendant's videotaped statement wherein he admitted involvement in offense, but denied shooting victim, tended to connect him to offense); *Matthews v. State*, 999 S.W.2d 563, 566 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (holding defendant's confession to his sister, whose written statement detailing confession was admitted at trial, tended to connect him to offense); *see also Collier v. State*, No. 01-09-00478-CR, 2010 WL 5250885, at *3 (Tex. App.—Houston [1st Dist.] Dec. 9, 2010, no pet.) (mem. op., not designated for publication) (holding inculpatory statements made by defendant to non-accomplice roommates, including statement that roommate "might see something on the news," corroborated accomplice testimony).

Further, Eric testified that during a second conversation with both Matt and Larry, Matt stated that "[Lea] was deceased and her body was disposed of in another county," and Larry did not refute this. *See Paredes v. State*, 129 S.W.3d 530, 535–36 (Tex. Crim. App. 2004) (recognizing silence as adoptive admission by party

opponent); TEX. R. EVID. 801(e)(2)(B) (excluding from hearsay adoptive admission by party opponent); *see also Webb v. State*, No. 01-11-00403-CR, 2012 WL 1564298, at *5 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. ref'd) (mem. op., not designated for publication) (determining that non-accomplice's testimony as to appellant's silence during conversation wherein non-accomplice witness stated appellant committed crime corroborated accomplice's testimony). The jury, as the trier of fact and sole judge of the credibility of witnesses, was free to believe or disbelieve all or any part of Eric's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986), *cert. denied*, 488 U.S. 872 (1988).

Dwayne and Lieutenant Moore testified as to Larry's flight following Lea's disappearance. As noted above, Dwayne testified that he drove Larry to Oklahoma and then did not hear from him for ten or eleven months. Likewise, Lieutenant Moore testified that after her interview with Larry on September 5, 2020, Larry "left within a couple of days" despite her request that he stay in town or let her know if he left. Lieutenant Moore recalled that Larry was gone for eight months or longer and was eventually arrested in Wisconsin. Evidence of flight serves to corroborate the accomplice testimony. *Cockrum v. State*, 758 S.W.2d 577, 582 (Tex. Crim. App. 1988).

In reviewing the evidence to determine whether it tends to connect Larry to the offense, we must consider the evidence in the light most favorable to the verdict.

*See Smith*, 332 S.W.3d at 442. Larry's arguments rely on considering the evidence in a manner contrary to the jury's verdict. To the extent that the evidence gives rise to conflicting views, we must defer to the jury's resolution of any conflicts in the evidence. *See id.*

Further, we disagree with Larry that the State only presented evidence of Matt's motive to harm Lea and tamper with evidence of her death. Larry's written statement and recorded interviews detail a long and tumultuous relationship between the couple, including Lea's repeated efforts to lie and steal from him, and her drug use. Larry also admitted that Lea was angry with Larry's efforts (or lack thereof) to celebrate her birthday on August 10, 2020, just hours before she was last seen around midnight on August 11, 2020. Though Larry used the last of his paycheck to buy groceries to cook Lea's favorite meal, Lea complained that he did not buy any beer or cigarettes. From this, as well as testimony from officers who were called out to the apartment and gas station (which is other evidence that the situation in the apartment was escalating), and Larry's discovery of what he believed to be drugs under Lea's dresser, the jury could have reasoned that Larry had a motive to tamper with evidence of Lea's death (her corpse). Though evidence demonstrating motive or opportunity of the accused to commit the crime is insufficient alone to corroborate accomplice witness testimony, it may be considered in connection with other evidence which tends to connect the accused with the crime. *Reed*, 744 S.W.2d at

127 (concluding evidence of affair could be considered in connection with all other evidence tending to connect appellant to wife's murder).

Considering all the non-accomplice evidence, including Larry's own statements, we conclude that the State presented sufficient evidence that tends to connect Larry to the charged offense of tampering with physical evidence.

**Legal Sufficiency**

As mentioned earlier, Larry appears to confuse the standards of proof for the sufficiency of corroborating evidence and legal sufficiency to support the jury's verdict as a whole. As this Court has explained, "[a] challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict." *Utomi v. State*, 243 S.W.3d 75, 80 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Because Larry's brief can be read as challenging both the sufficiency of the corroborating evidence and the legal sufficiency of the evidence supporting the verdict, we turn now to the issue of legal sufficiency.

**A.      Standard of Review and Applicable Law**

When, as here, we are asked to review the legal sufficiency of the evidence, we review *all* the evidence in the light most favorable to the judgment to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See id.* We do not eliminate the testimony of the accomplice witness when analyzing the legal sufficiency of the evidence as a whole.

24

*Long v. State*, 245 S.W.3d 563, 569 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The jurors are the exclusive judges of the facts, the credibility of witnesses, and the weight given to their testimony. *Id.* (citing *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)). A jury is entitled to accept one version of the facts and reject another or reject any part of a witness's testimony. *Id.*

Regarding the offense at issue, a person commits the offense of tampering with physical evidence if the person, (1) knowing that an offense has been committed, (2) alters, destroys, or conceals any record, document, or thing (3) with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense. TEX. PENAL CODE § 37.09(d)(1); *see also Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014).

**B.     Analysis**

On appeal, Larry only challenges the legal sufficiency of the evidence as to the second element of the offense of tampering with physical evidence—the altering, destroying, or concealing requirement. *See* TEX. PENAL CODE § 37.09(d)(1). Specifically, Larry contends that "[t]he evidence of alteration is insufficient" because "there was no evidence that [the] physical state [of the corpse] was changed."

While Larry's argument focuses on the "alteration" language, the statute also includes destroying or concealing as alternative methods for tampering with evidence. Further, the indictment included all three alternatives[9], as did the trial court's charge to the jury. Thus, the State alleged alternate manners and means of committing the charged offense of tampering with physical evidence. Additionally, the jury returned a general verdict of "guilty of the offense of Tampering with Physical Evidence, as alleged in the indictment."

An indictment may contain as many separate paragraphs charging the same offense as is necessary to meet the contingencies of the evidence. *Graham v. State*, 19 S.W.3d 851, 853 (Tex. Crim. App. 2000). When alternate manners or means of committing a crime are alleged, it is sufficient to prove only one of the manners or means set forth in the indictment. *See Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 1016 (2000) (noting that jury was charged in disjunctive and evidence was sufficient to support finding that appellant killed victim in one of manners alleged); *Kitchens v. State*, 823 S.W.2d 256, 258–59 (Tex. Crim. App. 1991), *cert. denied*, 504 U.S. 958 (1992) (holding jury's general guilty

---

[9]   The indictment alleged that King, "knowing that an offense has been committed[, did] alter or destroy or conceal a thing to wit: a human corpse[,] with intent to impair its verity, or legibility or availability as evidence in any subsequent investigation of or official proceeding related to the offense."

verdict on indictment charging alternative theories of committing same offense will be upheld if evidence supports any of theories alleged).

Here, Larry does not argue on appeal that the evidence is legally insufficient to support a finding that he destroyed or concealed Lea's body. Because Larry does not challenge the legal sufficiency of the evidence underlying the two alternative theories presented to the jury, we are required to uphold the jury's verdict. *See Henderson v. State*, 77 S.W.3d 321, 326–27 (Tex. App.—Fort Worth 2002, no pet.) (holding that, when appellant fails to challenge legal sufficiency of evidence as to alternate manners and means, appellate court is required to uphold sufficiency of evidence if evidence is sufficient to convict under any of submitted allegations); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) (holding that "[w]hen a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld").

Nevertheless, our review of the record evidence in this case demonstrates that legally sufficient evidence does exist to support a finding that Larry at least concealed Lea's body, as alleged in the indictment. First, Matt testified that he and Larry decided that they "were going to take [Lea] somewhere where [they] could dispose of her body." Throughout Matt's testimony, references were made to "dumping" Lea's body "in the woods." He testified that they located a pipeline right-of-way, and after walking the area to make sure their vehicle would not get stuck,

drove down the right-of-way and removed Lea's body from the trunk. They then took the body out of the blanket it was wrapped in and wiped it down with bleach "to take any fingerprints off of her."

Later, Michael Thomas, a former crime scene investigator with Brazoria County Sherriff's Department, testified about the location of Lea's body. He testified that the area was off County Road 477, which he described as "an empty road." He explained that the body was found off the pipeline right-of-way, a "40[-]foot[-]wide remote area [that] was wooded on both sides." Thomas testified that at night, the area was "extremely dark" because there were no residences or businesses in close proximity. The body itself was located in a small opening in the tree line off the right-of-way, which Thomas explained "could have been for deer and other game that would have went into the woods." He further described the opening as "very dark . . . [j]ust like any area where you have game and wildlife that live, there [were] holes dug, spiderwebs, grapevines, everything that you can imagine you're trying to get through." Photographs admitted at trial likewise depicted the remote nature of the area in which investigators located Lea's remains.

Though the tampering-with-evidence statute does not define "conceal," various Texas courts have considered the issue. *See, e.g.*, *Thornton v. State*, 401 S.W.3d 395, 398 (Tex. App.—Amarillo 2013) *rev'd on other grounds*, 425 S.W.3d 289 (Tex. Crim. App. 2014); *Lewis v. State*, 56 S.W.3d 617, 625 (Tex. App.—

28

Texarkana 2001, no pet.). More recently, in *Stahmann v. State*, the Texas Court of Criminal Appeals agreed with the lower court in a tampering-with-evidence case that "[a]ctual concealment requires a showing that the allegedly concealed item was hidden, removed from sight or notice, or kept from discovery or observation." 602 S.W.3d 573, 581 (Tex. Crim. App. 2020).

Applying that definition to the present case, legally sufficient evidence establishes that Matt and Larry's placement of Lea's body in a remote, wooded area, away from the roadway and far from any homes or businesses, kept the body "hidden" and "removed from sight," thus establishing concealment for purposes of the tampering-with-evidence statute. *See id.* Larry's concealment is further demonstrated by the fact that the body was not discovered until Matt revealed the location to law enforcement. Viewing the totality of the evidence in the light most favorable to the verdict, including the testimony of Larry's accomplice (Matt), *see Long*, 245 S.W.3d at 569–70, we hold that the evidence is legally sufficient to establish Larry's guilt and support the jury's verdict finding that Larry tampered with physical evidence.

We overrule Larry's issue.

## Conclusion

We affirm the trial court's judgment of conviction.

Amparo Monique Guerra
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).